For the reasons stated in this opinion, we affirm the rulings of the Territorial Court.

### ORDER OF THE COURT

**AND NOW** this 5 day of April 2000, having considered the arguments and submissions of the parties, and for the reasons set forth in the Court's accompanying opinion of even date, it is hereby

**ORDERED AND ADJUDGED** that the rulings of the Territorial Court are **AFFIRMED.**

### In re CRIIMI MAE, INC. SECURITIES LITIGATION.

#### No. DKC 98–3373.

United States District Court, D. Maryland.

March 30, 2000.

Charles J. Piven, Law Offices of Charles J. Piven, P.A., Baltimore, MD, Stephen T. Rodd, Abbey and Ellis, New York City, James S. Notis, New York City, Clifford S. Goodstein, Paul D. Young, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Jordan L. Lurie, James E. Tullman, Los Angeles, CA, for Robert A. Clarke.

Lawrence Joseph Quinn, John B. Isbister, Tydings and Rosenberg, Baltimore, MD, Deborah R. Gross, Gross and Metzger, Philadelphia, PA, for Sandra Bernstein.

Steven J. Toll, Cohen, Milstein, Housfeld and Toll, Daniel A. Small, Washington, DC, for Charles Kubinski, Bruce Montague.

Charles J. Piven, Law Offices of Charles J. Piven, P.A., Baltimore, MD, Peter C. Harrar, Wolf, Haldenstein, Adler, Freeman & Hertz, New York City, for Murray M. Rubin.

John B. Isister, Tydings and Rosenberg, Baltimore, MD, Bernard M. Gross, Gross and Metzger, Philadelphia, PA, Steven G. Schulman, Milberg, Weiss, et al, New York City, Lawrence G. Soicher, New York City, for Vierme, Inc.

Ronald B. Rubin, Timothy Michael Monahan, Rubin & Monahan, Chartered, Rockville, MD, for Irene Mohr.

Steven J. Toll, Cohen, Milstein, Housfeld and Toll, Daniel A. Small, Washington,

DC, Andrew N. Friedman, Cohen, Milstein, Hausefeld & Toll, Washington, DC, for Charles J. Kitchner, Carol L. Kitchner, Alvin Schindler.

Charles J. Piven, Law Offices of Charles J. Piven, P.A., Baltimore, MD, for Marion K. Elicati, Jeffrey A. Geller, Leonard Frank, Marian Dragonette, Seena Stevens Silverman, Glenn Stevens.

Lawrence Joseph Quinn, John B. Isbister, Tydings and Rosenberg, Baltimore, MD, Leonard Barrack, Daniel E. Bacine, Barrack, Rodos & Bacine, Philadelphia, PA, for Irving L. Mazer.

Andrew N. Friedman, Cohen, Milstein, Hausefeld & Toll, Washington, DC, for Joel M. Cohen, Mary T. Cohen, Elaine Slutsky.

Sherrie R. Savett, Berger & Montague, Philadelphia, PA, Andrew N. Friedman, Cohen, Milstein, Hausefeld & Toll, Washington, DC, for Mary Olive Arllen, Leonard Slutsky.

Burton Finkelstein, Donald J. Enright, Finkelstein, Thompson & Loughran, Washington, DC, for Robert T. Quasius.

Daniel A. Small, Washington, DC, Andrew N. Friedman, Cohen, Milstein, Hausefeld & Toll, Washington, DC, Andrew N. Friedman, Cohen, Milstein, Hausefeld & Toll, Washington, DC, for Brotherhood of Locomotive Engineers Division 269 Pension Fund and Welfare Fund.

Timothy W. Mungovan, Deborah L. Thaxter, Peabody & Brown, Boston, MA, for William B. Dockser, H. William Willoughby.

## MEMORANDUM OPINION

CHASANOW, District Judge.

This securities class action was brought on behalf of all persons who purchased securities of Criimi Mae, Inc. ("CMI") during the period from February 20, 1998 through October 5, 1998 (the "class period"). The Defendants are William B. Dockser, Chairman of CMI's board of directors, H. William Willoughby, president of CMI and a member of the board of directors, and Cynthia Azzara, chief financial officer and treasurer of CMI. Plaintiffs allege violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and of Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5. Pending before the court is Defendants' motion to dismiss Plaintiffs' Amended and Consolidated Class Action Complaint. The issues have been fully briefed, and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the motion will be GRANTED.

## I. Background

### A. CMI's Business

CMI is a commercial mortgage company structured as a self-administered real estate investment trust ("REIT"). CMI's primary business activities include acquiring, originating, securitizing and servicing commercial mortgages and mortgage related assets. According to the complaint, CMI's business focuses on acquiring high-risk subordinated commercial mortgage-backed securities ("CMBS"), and originating and servicing commercial mortgage loans and securitizing the loans into CMBS.

CMBS are created in a process known as "securitization." The securitization is a sale to investors of an interest paying security (such as a bond) that is secured (or "backed") by a portfolio of commercial mortgage loans that have been pooled together. The securities receive cash flow from the pooled loans and pay fixed rates of interest. The securities are issued in various categories (or "tranches") that bear differing degrees of risk. According to the complaint, CMI did not acquire (or retain from its own loan pools) the higher rated securities, but instead acquired lower-rated subordinated CMBS from other issuers and retained the subordinated CMBS that it securitized.[1] Plaintiffs al-

---

1. Because they bear a higher degree of risk of default and prepayment, the subordinated

lege that CMI was virtually the only significant purchaser of subordinated CMBS and, as a result, the CMBS were essentially illiquid.

CMI utilized its portfolio of subordinated CMBS to finance its own growth, borrowing funds for its mortgage loan activities and to acquire the subordinated CMBS, and using the subordinated CMBS as collateral.[2] According to the complaint, the valuation of the CMBS as collateral was highly subjective because they were not widely traded and bore a high degree of risk. Plaintiffs claim that CMI's investment bankers/lenders retained discretion to value the CMBS put up by CMI as collateral and could require CMI to put up more collateral (either in the form of cash or additional CMBS) to secure CMI's outstanding loans when their views changed about the value of the CMBS already pledged.

In addition to the collateral valuation risk, Plaintiffs allege that CMI faced "asset liability mismatch interest rate risk." By making long-term loans at fixed rates and using short-term floating rate borrowings to finance those loans, CMI was vulnerable to increases in short-term interest rates. If short-term interest rates were to rise, the profitability of CMI's long-term loans would fall as the gap between the interest CMI was paying on its short-term borrowings and the interest CMI was earning on its commercial mortgages narrowed. To partially offset this risk and cushion the impact of rising interest rates on its floating rate debt, CMI entered into various "hedging" agreements whereby CMI would be paid money if interest rates rose above a certain level. Under CMI's loan origination agreements with two of its investment bankers, Citibank and Prudential, the investment bankers were responsible for arranging the hedge contracts and providing CMI with written "hedge" reporting.

### B. CMI's Bankruptcy

According to the complaint, on or about October 2, 1998, CMI's lenders revalued the CMBS that were serving as collateral for CMI's loans. The lenders called on CMI to provide additional collateral based on a downward revaluation of the CMBS. Because CMI was unable to meet the collateral call, and thus risked default under a substantial portion of its financing arrangements, CMI announced on October 5, 1998 that it was filing for protection under chapter 11 of the bankruptcy code. Trading in CMI stock was halted. When trading resumed on October 7, 1998, the price of CMI stock was 1–5/16. CMI stock was trading at 6–15/16 just prior to the announcement that CMI had filed for bankruptcy, and traded as high as 16–1/8 during the class period.

### C. The Alleged Misrepresentations and Omissions

Plaintiffs claim that throughout the class period Defendants caused CMI to file documents with the SEC and issue press releases that operated as a fraud on the market because they omitted material information. The complaint is cumbersome, redundant and largely unhelpful in its presentation of the allegations against Defendants. After careful review, however, the court has boiled the 55 page complaint down to four categories of alleged

CMBS pay a higher rate of interest. According to the complaint, CMI was the first major commercial mortgage lender to permit commercial borrowers to prepay their commercial mortgage loans without significant penalties. Prepayments typically occur when interest rates drop and borrowers refinance their loans at lower rates. Prepayment affects the lender in two ways: 1) its income is lower because the lender is no longer receiving interest on a loan it made at a higher rate, and 2) it can only loan out the money at the new lower interest rates. Plaintiffs claim that by introducing prepayment options into its commercial loans, CMI introduced an additional risk into the securities it issued that were backed by these loans.

**2.** As a REIT, CMI was required to pay dividends of at least 95% of its income. Because of this distribution requirement, CMI had to rely on outside sources of capital to fund its growth.

omissions and misrepresentations by Defendants. First, Plaintiffs allege that Defendants failed to disclose the nature of the relationship between CMI and its lenders. Plaintiffs describe that relationship as one in which the lenders essentially controlled CMI's financial destiny. It is alleged that CMI borrowed money on terms that allowed CMI's lenders "unilaterally and subjectively" to establish the value of the collateral securing those loans (the subordinated CMBS) and to require additional CMBS as collateral (a "collateral call") when their views changed about the value of the CMBS already put up as collateral. This, according to Plaintiffs, left CMI "at the mercy" of its lenders and subject to the risk that it would be faced with collateral calls it could not predict or meet.

Second, it is alleged that Defendants failed to disclose that the subordinated CMBS were "illiquid" and that the illiquidity resulted in an increased likelihood that the collateral would be valued by CMI's lenders at a depressed price and leave CMI with inadequate unencumbered assets to meet collateral calls by its creditors. Third, Plaintiffs allege that Defendants failed to disclose material information regarding CMI's exposure to the risk of interest rate fluctuations. Fourth, Plaintiffs allege that Defendants, in connection with a September 25, 1998 press release, failed to disclose that a recent decline in the market value for CMBS would have a negative effect on their lenders' perception of the adequacy of collateral they held and would prompt a substantial collateral call that CMI could not meet.

## II. *Applicable Pleading Standards*

A. *Pleading Requirements of Rules 12(b)(6), 9(b) and the PSLRA for Claims of Securities Fraud*

■ A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) will not be granted

unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In reviewing the complaint, the court accepts all well-pled allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir.1997). In deciding a Rule 12(b)(6) motion, the court will consider the facts stated in the complaint and the documents attached to the complaint. The court may also consider documents referred to in the complaint and relied upon by plaintiff in bringing the action. *Biospherics, Inc. v. Forbes, Inc.,* 989 F.Supp. 748, 749 (D.Md. 1997) (citing *Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 46–48 (2d Cir. 1991)). Thus, it is appropriate for the court to consider the relevant press releases and public disclosure documents referenced and relied upon by Plaintiffs without converting the motion to dismiss into a motion for summary judgment.

■ To survive the motion to dismiss, Plaintiffs must have alleged facts that show they are entitled to relief on their substantive causes of action. To state claim for relief under § 10(b) and Rule 10b–5, Plaintiffs must sufficiently allege that (1) Defendants made a false statement or omission of material fact (2) with scienter [3] (3) upon which Plaintiffs justifiably relied (4) that proximately caused Plaintiffs' damages. *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 613 (4th Cir.1999) (citing *Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 208 (4th Cir.1994)). When, as here, a plaintiff alleges a "fraud on the market" theory, it is not necessary to prove individual reliance on the false or misleading statements. *See Longman v. Food Lion, Inc.,* 197 F.3d 675, 682 n. 1 (4th Cir.1999); *Ganesh, L.L.C. v. Computer*

---

3. Scienter is a "mental state embracing an intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

*Learning Ctrs., Inc.*, 183 F.R.D. 487, 491 (E.D.Va.1998). Instead, Plaintiffs may show that they indirectly relied on statements by relying on the integrity of the market price of the stock. *Longman*, 197 F.3d at 682 n. 1.

■■ Because § 10(b) claims are fraud claims, the plaintiff must also satisfy the pleading requirements imposed by Fed. R.Civ.P. 9(b). *In re Medimmune, Inc. Securities Litig.*, 873 F.Supp. 953, 960 (D.Md.1995). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Particularity of pleading is required with regard to the time, place, speaker[4] and contents of the allegedly false statement, as well as the manner in which the statements are false and the specific facts raising an inference of fraud. *Medimmune*, 873 F.Supp. at 960. The requirement of pleading with particularity provides defendants with fair notice of the plaintiff's claims, protects defendants from harm to their reputation or good will, and reduces the number of strike suits. *Gollomp v. MNC Fin., Inc.*, 756 F.Supp. 228, 232 (D.Md.1991) (stating that Rule 9(b) pleading requirement is designed to prevent plaintiffs, acting on suspicions, from using the fraud suit itself as the vehicle for initially uncovering the fraud).

The Private Securities Litigation Reform Act ("PSLRA") imposes additional pleading requirements on plaintiffs in securities fraud actions. Most notably, the PSLRA has heightened the requirements of Rule 9(b) for pleading scienter. Under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Under the PSLRA, however, a complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

B. *Section 20(a) Controlling Person Liability*

To state a claim for controlling person liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Plaintiffs must allege:

a primary violation by the controlled person and control of the primary violator by the targeted defendant, and ... that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person. Control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

---

4. Most of Plaintiffs' allegations of primary liability against Defendants are premised on the "group published information" doctrine, which relaxes the requirements of Rule 9(b) in cases of corporate fraud. Under this doctrine, corporate officers and directors who are alleged to be in day-to-day control of the company may be presumed, for pleading purposes, to be collectively responsible for a company's "group published" information such as prospectuses, registration statements, annual reports, press releases and other public filings. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987). Thus, the plaintiffs need not set forth with particularity which corporate officers conveyed a misrepresentation when the misleading information is contained in group publications. *Id.*

The parties disagree as to whether the doctrine applies in the Fourth Circuit. In *Juntti v. Prudential-Bache Securities, Inc.*, 1993 WL 138523 (4th Cir. May 3, 1993), an unpublished opinion, the Fourth Circuit indicated an unwillingness to apply the doctrine. *See id.* at *2. Judge Messitte of this court, relying on *Juntti*, declined to recognize the doctrine. *See Medimmune*, 873 F.Supp. at 960 n. 7, 964. *Juntti* and *Medimmune* are pre-PSLRA cases. Some courts have held that the group published information doctrine did not survive the enactment of the PSLRA. *See, e.g., Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, 915–16 (N.D.Tex. 1998). For reasons that will become clear below, it is unnecessary for the court to decide whether the group published information doctrine applies in this case.

*SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996) (citations omitted); *see In re Cryomedical Sciences, Inc. Sec. Litig.,* 884 F.Supp. 1001, 1012 (D.Md.1995). Of course, if Plaintiffs fail to state a claim for a primary violation of § 10(b) and Rule 10b–5, they likewise fail to state a claim against individual defendants as controlling persons. *Id.* at 1011–12 (citing *Malone v. Microdyne Corp.,* 824 F.Supp. 65, 66 n. 1 (E.D.Va.1993), *rev'd on other grounds,* 26 F.3d 471 (4th Cir.1994)).

### III. *Analysis*

#### A. *Section 10(b) and Rule 10b–5 Claims*

As noted above, the PSLRA requires Plaintiffs to plead with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The "required state of mind" for liability under § 10(b) and Rule 10b–5, i.e., scienter, is not defined in the PSLRA, and there is "widespread disagreement among courts" as to what a plaintiff must show to prove scienter under the PSLRA. *See Phillips,* 190 F.3d at 620–21. Several standards have emerged. The Second and Third Circuits have held that the requisite "strong inference" of scienter may be established by either (a) alleging facts to show that defendants had both motive and opportunity to commit fraud or (b) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.[5] *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 537 (2d Cir.1999); *In re Advanta Corp. Securities Litig.,* 180 F.3d 525, 534–35 (3d Cir.1999); *see also Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 178 (5th Cir.1997) (noting that the PSLRA, though it did not apply to the case at hand, adopted the same standard as the Second Circuit). The Ninth Circuit has held that "a private securities plaintiff

proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc. Securities Litig.,* 183 F.3d 970, 974 (9th Cir.1999). The *Silicon Graphics* court distinguished "deliberate" recklessness from the "simple" recklessness standard required under the Second Circuit test, stating that under the standard it was announcing a plaintiff "must state facts that come closer to demonstrating intent." *Id.*

The Sixth and Eleventh Circuits have held that a plaintiff may survive a motion to dismiss under the PSLRA by pleading facts that give rise to a strong inference of "simple" recklessness, but that evidence of a motive and opportunity to commit securities fraud does not constitute scienter for purposes of § 10(b) or Rule 10b–5 liability. *In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 550–51 (6th Cir.1999); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1283 (11th Cir.1999). The First Circuit adopted a standard that it characterized as being "close" to that articulated by the Sixth Circuit, but rejected the argument that facts showing motive and opportunity could never be enough to permit the drawing of a strong inference of scienter. *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196–98 (1st Cir.1999) (stating that the debate about adoption of the Second Circuit standard was "somewhat beside the point," noting that the First Circuit has always "analyzed the particular facts alleged in each individual case to determine whether the allegations were sufficient to support scienter").

The Fourth Circuit has "not yet determined which pleading standard best effectuates Congress's intent." *Phillips,* 190 F.3d at 621. In *Phillips,* the Fourth Circuit did not address the issue because it

---

5. This standard was applied by the Second Circuit prior to the PSLRA, *see Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994), and was the most stringent test for pleading scienter under § 10(b) or Rule 10b–5, *see In re Comshare, Inc. Securities Li-*

*tig.,* 183 F.3d 542, 549 (6th Cir.1999). Varying interpretations of the PSLRA's legislative history has led to the disagreement among courts as to whether the PSLRA incorporated the Second Circuit standard or heightened it.

found that the plaintiff stockholders "failed to allege facts sufficient to meet even the most lenient standard possible under the PSLRA, the two-pronged Second Circuit test." *Id.* Like the court in *Phillips,* this court need not decide the appropriate standard for pleading scienter under the PSLRA because the court finds that Plaintiffs have failed to satisfy the Second Circuit standard.

Throughout the complaint, Plaintiffs state in a conclusory fashion that Defendants were engaged in a "fraudulent scheme," and "knew but failed to disclose," "knowingly or recklessly failed to disclose" and acted to "conceal" adverse material information. These allegations, however, are " 'so broad and conclusory as to be meaningless,' " and cannot support an inference of intent to defraud. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994) (bare allegations that defendants "knew but concealed" and "knew or were reckless in not knowing" certain material information held insufficient) (quoting *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 119–20 (2d Cir. 1982)).

Plaintiffs attempt to provide more detailed allegations of scienter in paragraphs 92–96 of the complaint, which are preceded by the heading "Additional Scienter Allegations." Those allegations read as follows:

92. As alleged herein, defendants acted with scienter in that they (1) knew or recklessly disregarded that the public documents and statements issued or disseminated by them in the name of the Company were materially false and misleading; (2) knew or recklessly disregarded that such documents and statements would be issued or disseminated to the investing public; and (3) knowingly participated in the issuance or dissemination of such documents and statements as primary violators of the federal securities laws.

93. By virtue of defendants' receipt of information reflecting the truth about the precarious nature of the Company's business and finances and/or by virtue of their control over the Company, which made them privy to confidential proprietary information, defendants participated in the fraudulent scheme alleged herein. With respect to non-forward looking statements or omission, defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

94. Defendants were involved in the day-to-day activities of the Company, as described above in paragraphs 20 through 22 above, were responsible for the very information that was misrepresented to the investing public. Defendants signed CMI's public filings with the SEC that contained statements which, because of their positions within the Company, their responsibility for CMI's operations, their extensive experience in and knowledge of the real estate finance industry and their access to information about the Company's financial dealings, defendants knew or were reckless in not knowing were false and misleading.

95. The defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each is a senior executive officer of CMI and, accordingly, controlled the information disseminated to the investing public in the Company's press releases, SEC filings, and communications with analysts. Thus, each could falsify, and did falsify, the information that reached the public about CMI's business and financial condition, results of operations and future prospects.

96. Defendants had a motive to misrepresent CMI's business and financial condition in order to protect their executive positions. Furthermore, defendants had a motive to maintain the artificially inflated price of CMI's stock to maintain the value of their stock and option holdings, which were a substantial portion of their compensation.

The court will first examine Plaintiffs' "motive and opportunity" allegations.

### 1. *Motive and Opportunity*

█ Motive to commit fraud would entail "concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged." *Phillips*, 190 F.3d at 621 (quoting *Shields*, 25 F.3d at 1130). "Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130. There can be no question that Defendants, given their positions of power and authority within CMI, have the opportunity to commit fraudulent acts. *See Phillips*, 190 F.3d at 621 (finding that Chairman and CEO of company "undeniably" had the opportunity to cause an artificial depression in the price of the company's stock); *see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies*, 75 F.3d 801, 813 (2d Cir.1996). Plaintiffs, however, have not pled sufficient facts regarding Defendants' motive to commit fraud.

Plaintiffs' only allegations relating to motive are that Defendants sought to "protect their executive positions" and "had a motive to maintain the artificially inflated price of CMI's stock to maintain the value of their stock and option holdings, which were a substantial portion of their compensation." In *Phillips*, the Fourth Circuit made clear that these types of allegations, without more, are insufficient to create a strong inference of scienter:

> Allegations that "merely charge that executives aim to prolong the benefits they hold" are, standing alone, insufficient to demonstrate the necessary strong inference of scienter. For this reason assertions that a corporate officer or director committed fraud in order to retain an executive position, or retain such a position with the merged company, simply do not, in themselves, adequately plead motive. Similarly insufficient are allegations that corporate officers "were motivated to defraud the public because an inflated stock price would increase their

compensation." To support a claim of motive based on the benefit a defendant derives from an increase in the value of his holdings, a plaintiff must demonstrate some sale of "personally-held stock" or "insider trading" by the defendant.

*Phillips*, 190 F.3d at 622 (citations omitted); *see also Shields*, 25 F.3d at 1130; *Branca v. Paymentech, Inc.*, 2000 WL 145083, at *10 (N.D.Tex. Feb.8, 2000) (allegation that CEO was motivated to inflate falsely the price of the company's stock because she owned a large number of shares and took a significant portion of compensation in stock options held insufficient to establish motive absent allegation of trading activity during class period). Plaintiffs have not pled any facts regarding Defendants' trading activities during the class period. Their only allegations of motive are precisely the kind the *Phillips* court found to be insufficient. Plaintiffs have therefore failed to adequately allege facts that raise a strong inference that Defendants had a motive to commit fraud.

### 2. *Conscious Misconduct or Recklessness*

█ Plaintiffs have also failed to allege any facts that would constitute "strong circumstantial evidence of conscious misbehavior or recklessness." "Simple" recklessness, the degree of recklessness that must be shown under the Second Circuit standard for proving scienter, is defined as an act "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips*, 190 F.3d at 621 (quoting *Hoffman v. Estabrook & Co.*, 587 F.2d 509, 517 (1st Cir.1978) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977))). "Reckless" in this context is viewed as a lesser form of intent, rather than merely a greater degree of ordinary negligence, *see Hoffman*, 587 F.2d at 516, and mere negligence is

not sufficient to support liability, *Phillips,* 190 F.3d at 621 (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 215, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). There is a "significant burden on the plaintiff in stating a fraud claim based on recklessness," *Chill v. General Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996), and a plaintiff's allegations "must be based on a substantial factual basis in order to create a 'strong inference' that the defendant acted with the required state of mind," *Phillips,* 190 F.3d at 621. Plaintiffs do not meet this burden.

■ Plaintiffs' claim that Defendants consciously or recklessly caused CMI to issue materially false and misleading statements is premised entirely on the fact that Defendants held positions of control within CMI, were responsible for its core operations, and were involved in CMI's day-to-day activities. This fact, according to Plaintiffs, means that Defendants received information "reflecting the truth about the precarious nature of [CMI's] business and finances," and were "privy to confidential proprietary information." The complaint continues:

> Defendants signed CMI's public filings with the SEC that contained statements which, because of their positions within [CMI], their responsibility for CMI's operations, their extensive experience in and knowledge of the real estate finance industry and their access to information about the company's financial dealings, defendants knew or were reckless in not knowing were false and misleading.

These facts, standing alone, are not sufficient to raise a strong inference of scienter. If they were, every corporate executive who participates in the day-to-day management of his company would be exposed to liability for securities fraud. Several courts have found similar allegations insufficient to establish a strong inference of scienter. *See In re Peritus Software Servs., Inc. Securities Litig.,* 52

F.Supp.2d 211, 228 (D.Mass.1999) (finding allegations that defendants held executive and managerial positions and had access to the alleged adverse non-public information insufficient to raise strong inference that defendants had knowingly or recklessly caused the company to issue statements that were false or omitted material information); *Lirette v. Shiva Corp.,* 27 F.Supp.2d 268, 283 (D.Mass.1998) (rejecting attempt to plead scienter by asserting that CEO and CFO "were privy to confidential proprietary information concerning the Company and its operations, finances, financial condition, products and business prospects"); *Zeid v. Kimberley,* 973 F.Supp. 910, 924–25 (N.D.Cal.1997) (general allegations of access to internal company documents by top executives do not amount to contemporaneous facts showing that defendants knew, or were reckless in not knowing, their statements were false when made, and thus are insufficient under the PSLRA), *vacated,* 201 F.3d 446 (9th Cir.1999) [6]; *In re Health Mgmt., Inc. Securities Litig.,* 970 F.Supp. 192, 204–05 (E.D.N.Y.1997) (allegation that defendant held senior management position and was "privy to inside information" insufficient, standing alone, to demonstrate strong inference of recklessness or conscious misbehavior); *Duncan v. Pencer,* 1996 WL 19043, at *14 (S.D.N.Y.1996) (allegation that due to their positions with the company and access to inside information, defendants must have known of the falsity of financial statements filed with the SEC was insufficient to plead conscious misbehavior or recklessness).

Plaintiffs in this case essentially rely on the general inference that, because of their positions with CMI, Defendants "must have known" the statements issued by CMI were false and misleading at the time they were issued. That type of inference, however, is inadequate to withstand the special pleading requirements in securities fraud cases. *See Lirette,* 27 F.Supp.2d at

---

**6.** *Zeid* was decided under the Second Circuit standard for pleading scienter and was vacated for reconsideration in light of the Ninth Circuit's decision in *Silicon Graphics. See Zeid v. Kimberley,* 1999 WL 993649, at *1 (9th Cir. Nov.1, 1999).

283 (quoting *Maldonado v. Dominguez,* 137 F.3d 1, 10 (1st Cir.1998)). Without more, Plaintiffs' complaint fails to allege sufficient facts to raise a strong inference that Defendants knew, or were reckless in not knowing, that the alleged misleading statements were materially false or misleading when they made them.

■ In their opposition to the motion to dismiss, Plaintiffs argue that the proximity in time between the September 25, 1998 press release and CMI's filing for bankruptcy on October 5, 1998 is itself sufficient to create a strong inference of scienter. As Defendants point out, however, this is a classic example of pleading "fraud by hindsight." In the September 25, 1998 press release, Defendant Dockser stated, in part:

> Although the recent widening of spreads for commercial mortgage-backed securities (CMBS) has impacted the market value of CRIIMI MAE's CMBS portfolio, the company has been able to meet all of the collateral calls resulting from this spread widening. The same spread widening that has resulted in collateral calls also provides opportunities for CRIIMI MAE to acquire CMBS assets at more attractive yields than have been available in the recent past.

According to Plaintiffs, this attempt by Dockser to put a "reassuring spin" on news of a decline in the value of CMI's CMBS less than two weeks before filing for bankruptcy evidences fraudulent intent.

Mere proximity in time between optimistic or reassuring statements about a company's prospects and filing for bankruptcy protection does not give rise to a strong inference of scienter when, as here, the event that forced the company to seek bankruptcy protection did not occur until after the statements were made,[7] and there are no facts pled that would give rise to an inference that the defendants issuing the optimistic or reassuring statements

knew, or were reckless in not knowing, that the precipitating event (the October 2, 1998 collateral call) was going to occur. Plaintiffs do not challenge the truth of Dockser's statements in the September 25 press release that CMI, up to that point, was meeting all of its collateral calls, and have pled no facts that would give rise to a strong inference that Dockser knew, or was reckless in not knowing, that CMI would soon receive a collateral call it could not meet.

Plaintiffs may not rely simply on the discrepancy between a company's optimistic outlook and subsequent disappointing results to support a claim of fraud. Such allegations of "fraud by hindsight" do not satisfy the stringent pleading requirements of the PSLRA. *See Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 209 (4th Cir.1994). Because Plaintiffs have failed to plead facts giving rise to a strong inference that Defendants acted with scienter, they have failed to state a claim for relief under § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder.

B. *Section 20(a) Control Person Liability*

Plaintiffs' failure to state a claim for a primary securities fraud violation precludes a finding of control person liability. *Cryomedical,* 884 F.Supp. at 1011. The court will therefore dismiss Plaintiffs' claim for violation of § 20(a) of the Exchange Act.

IV. *Conclusion*

For the foregoing reasons, the Amended and Consolidated Class Action Complaint will be DISMISSED.

A separate Order will be entered.

---

7. The complaint alleges that the October 2, 1998 collateral call that CMI could not meet forced CMI to seek bankruptcy protection.

## ORDER

In accordance with the accompanying Memorandum Opinion, IT IS this ____ day of March, 2000, by the United States District Court for the District of Maryland, ORDERED that:

1. Defendants' Motion to Dismiss BE, and the same hereby IS, GRANTED;

2. Plaintiffs' Amended and Consolidated Class Action Complaint BE, and the same hereby IS, DISMISSED; and

3. The Clerk is directed to transmit a copy of this Order and the accompanying Memorandum Opinion to counsel for the parties and CLOSE this case.