In re HUMPHREY HOSPITALITY TRUST, INC. SECURITIES LITIGATION.

No. CIV.A. WMN–01–1662.

United States District Court, D. Maryland.

May 7, 2002.

Steven J. Toll, Seattle, WA, Mary N. Strimel, Cohen Milstein Hausfeld and Toll PLLC, Washington, DC, Marc A. Topaz, Schiffrin and Barroway LLP, Bala Cynwyd, PA, Paul J. Geller, Cauley Geller et al., Little Rock, AR, Victoria S. Nugent, Cohen Milstein Hausfeld and Toll PLLC, Washington, DC, Charles J. Piven, Law Offices of Charles J. Piven, Baltimore, MD, for plaintiffs.

Timothy D. Belevetz, Michele Rose, Laurie Smilan, James Christian Word, Wilson Sonsini Goodrich and Rosati, McLean, VA, for defendants.

## *MEMORANDUM*

NICKERSON, District Judge.

Before the Court is Defendants' Motion to Dismiss. Paper No. 11. The motion has been fully briefed and is ripe for decision. Upon review of the pleadings and applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that the motion will be granted.

### *I. BACKGROUND*

This is a class action securities fraud lawsuit brought against Humphrey Hospitality Trust, Inc. ("HHT" or "the Company") and three of its executive officers: Paul J. Schulte, James I. Humphrey, Jr., and Steven H. Borgmann.[1] Plaintiffs are a class of all persons or entities who pur-

---

1. This action was initially filed in the Eastern District of Virginia but was transferred to this Court on June 7, 2001. Also, four lawsuits

chased HHT securities during the period from November 14, 2000 through March 29, 2001 (the "Class Period"). Plaintiffs allege that, during the Class Period, Defendants issued false and misleading statements concerning the Company's financial condition and operations, in an alleged effort to artificially inflate the market price of HHT's securities and cause Plaintiffs to purchase HHT stock at inflated prices, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 promulgated by the Securities Exchange Commission.

Unless otherwise indicated, the Amended Complaint is the source of the following background information. HHT was incorporated in Virginia in 1994, and is a self-administered real estate investment trust ("REIT") for federal income tax purposes. On October 26, 1999, the Company and Supertel Hospitality, Inc. ("Supertel") consummated a merger. Prior to the merger, HHT owned 25 "upper economy" limited service hotels, which were managed by and leased to Humphrey Hospitality Management, Inc. ("HHM"), and Supertel owned 68 lower end limited service hotels, primarily Super 8 Motels. Pursuant to the merger, Supertel Hospitality Management, Inc. ("SHM") was formed to manage and lease the former Supertel Hotels as a subsidiary of HHM. SHM and HHM will be referred to collectively as "the Lessee." The Company relies on the payments under the leases for virtually all of its income.

Prior to the merger, Defendant Humphrey was the senior executive officer of HHT, and Defendants Schulte and Borg-

mann were the senior executive officers of Supertel. As a result of the merger, Defendants Schulte and Borgmann became the largest shareholders of HHT (approximately 8% and 9%, respectively). They also became senior executive officers of HHT, and were permitted to accelerate the vesting of their Supertel stock options prior to the merger. Defendant Humphrey has an option to elect the issuance of HHT stock which would give him a 6% share of the Company, and he is a 75% majority shareholder of the Lessee.

On October 19, 2000, the Company announced that it was maintaining its monthly dividend of $.077 per share-an annualized rate of $.924 per share. Based on the Company's closing stock price on that day of $7.0625 per share, the dividend reflected an annualized yield of 13.1 percent. Throughout the Class Period, HHT securities were traded on the NASDAQ. As of December 31, 2000, the Company owned 92 existing limited service hotels and one office building.

Plaintiffs' allegations of fraud stem from several announcements made by Defendants in late 2000 and early 2001. First, Plaintiffs point to three press releases, all dated November 14, 2000, which they allege to be false or misleading statement's about the Company's financial condition. In the first announcement, the Company disclosed its third quarter 2000 results. For the three months ended September 30, 2000, funds from operations per share ("FFO") decreased 6% from $.34 to $.32; for the nine months ended September 30, 2000, FFO increased 11% from $.92 to $1.02 compared to the same periods in 1999.[2] In the Amended Complaint, Plain-

were originally filed and were consolidated into this action by order of this Court on July 13, 2001.

**2.** Both the Amended Complaint and Defendants' motion state that the nine-month FFO decreased from $1.02 to $.92, but the actual

press release itself (attached as Exhibit 1 to Defendants' motion) states that it was an increase from $.92 to $1.02, which was "primarily due to the inclusion of the merged assets of Supertel Hospitality."

tiffs quote the portion of the press release where Defendant Schulte says, "If you exclude the non-recurring charges for our new service agreement and Marquette refinancing we continue to grow FFO as a result of the merger ...". Schulte also explained in the same press release, however, that "[l]ease revenue growth on a same store basis has been lower than expected due to increased competition."

In a second press release that same day, HHT announced the closing of its purchase of five Super 8 Hotels. Defendant Schulte was quoted as saying:

These hotels represent our first acquisition since the merger and are the first portfolio acquired by utilizing preferred operating partnership units. The issuance of convertible operating partnership units to acquire hotels provides benefits to both the company and the sellers. By contributing their hotels to our company in exchange for preferred operating partnership units, sellers achieve the benefits of diversifying their risk by becoming part of a much larger group of 92 hotels. The transaction also permits the sellers to defer any taxable gain and earn competitive dividends through ownership of the operating partnership units. The company, by issuing units, benefits by conserving cash and continuing to grow through acquisitions. The company intends to continue to examine additional growth opportunities by acquiring hotels through the issuance of operating partnership units.

The third press release of November 14, 2000, announced the Company's restructuring of its agreements with the Lessee. The changes included: (1) transferring the financial responsibility of paying property taxes and insurance from HHT to the Lessee; (2) reducing the Lessee's lease payments by approximately $4 million annually, to account for the transfer of responsibility for the property taxes and insurance; and modifying all quarterly, semi-annual, and annual percentage lease payments into a monthly payment system. According to the press release, "[t]his new lease structure should improve monthly cash flow for the Company and result in lower interest expense." Also, to be effective retroactively to January 1, 2000, the Company's services agreement with the Lessee was to be expanded to provide for "additional real estate portfolio management services" and "to compensate it for the additional services resulting from the merger," for an additional $750,000 in compensation annually. The press release also stated that:

The Company does not expect these changes to adversely affect future cash flow and does not anticipate any change in the current dividend. "Both the Company and the Lessee will benefit from the new lease and service agreements, as the interests of the owner and manager converge and we concentrate more on hotel profitability and faster hotel acquisition growth," said [Schulte].

Plaintiffs also allege that statements posted on the Company's website in early 2001 were false and misleading. In a section of the website entitled "our growth," the Company describes, *inter alia,* its acquisition of five hotels in October 2000, and states that those hotels have a "13% Anticipated Return." Plaintiffs in their Amended Complaint quote the following excerpt from the website section entitled "Investors' Overview," which was still on the website as of April 9, 2001, with the notation that it was "last updated 18–Feb–2001":

Humphrey Hospitality Trust is, exclusively, an owner and acquirer of nationally franchised limited-service properties in secondary and tertiary markets. We believe this represents a most attractive niche. Historically, the limited-service

segment of the lodging industry is less cyclical and produces higher profit margins than full-service properties. And we are one of the few publicly traded REITS focused on this segment of the lodging industry. Consequently, we don't compete with full-service lodging REITS in acquiring new properties.

Outlook:

We foresee a most exciting and promising future as we do business in the years 2000 and beyond. We will maintain our conservative standards and financing strategy. We look to preserve a debt-to-value ratio below 60 percent-which means we will not over leverage our hotel purchases. On a pro forma basis, dividend payments as a percent of funds from operations were approximately 60 percent-a very conservative and strong number as compared to our hotel REIT peers and the REIT industry overall. A 60 percent payout means that we retain a meaningful amount of funds for reinvestment in our business. It also supports a more secure dividend. We look forward to pursuing growth that both increases funds from operations and enhances the dividend stream for our shareholders.

Finally, Plaintiffs allege that Defendants again made false and misleading statements in a March 2, 2001 press release, which announced the Company's year-end 2000 results. Plaintiffs quote the following portion of the press release in their complaint:

"We are pleased with the growth in funds from operations for the year, which we posted despite intense competition in the limited-service segment of the lodging industry," said [Schulte]. "While our renegotiated outsourcing agreement with Humphrey Hospitality Management increases the cost of portfolio and administrative services-reflecting more realistic cost assumptions-it re-

mains far less costly than providing those services in-house."

For 2000, revenue per available room (REVPAR) declined 1 percent to $32.78. "REVPAR was hurt by new competition in some of our markets," said Schulte. "In fact, excluding properties that faced new market entrants within the past 12 months, REVPAR was up slightly, year-over-year, for the vast majority of properties. Our lessee, [HHM], is taking aggressive action to improve performance by stepping up its sales and marketing initiatives, tightening its control of property-level operations, and launching a number of capital refurbishment projects that will allow our properties to compete more effectively."

For the fourth quarter of 2000, FFO per diluted share declined 6 percent to $0.33 from $0.35 in the fourth quarter of 1999. Fourth quarter revenues increased 25 percent to $8.3 million, while total FFO increased 14 percent to $4.1 million.

Outlook

"While market conditions remain challenging, we expect to maintain our current dividend rate," concluded Schulte.

Plaintiffs allege that the Company's "true financial position" was revealed less than a month after the March 2, 2001 press release. On March 29, 2001, the Company announced that "the Lessee has advised the [Company] that, without a substantial reduction in the rent paid to the [Company] under the leases, the Lessee will be unable to lease and operate the [Company's] hotels." The press release reported that the Lessee "advised" the Company that it had incurred substantial, continuing losses during the year 2000, and that it expected to incur a net loss for the year 2000 of approximately $2.4 million. The Company also announced that it was forming an independent committee to

explore alternatives such as the formation of taxable subsidiaries that would engage third-party hotel managers, the reduction of rents, and the sale of some hotels. Finally, the press release stated that, as a result of these developments, FFO was expected to decline and the Company's dividend would be reduced as of March 30, 2001.

The market reacted quickly to the press release. That same day, HHT common stock opened at $7.0938 per share and closed at $4.7812, on volume of 217,200 shares, approximately seven times its average volume. From March 30 through June 29, 2001, the stock price averaged about $3.00 per share.

Plaintiffs allege that Defendants "did not need to be 'advised' by the Lessee about anything." Amended Complaint at ¶ 44(c). They contend that Humphrey, Schulte, and Borgmann had "immediate, day-to-day access" to the Lessee's operating results in the form of "Flash Reports." Flash Reports, according to Plaintiffs are provided by the general managers of the Company's properties, directly to HHT corporate headquarters. The reports set forth "the number of rooms occupied, revenue per room, total other revenues, current balances, and number of rooms rented to corporate accounts." The daily reports were consolidated into weekly and monthly reports, and the monthly reports were allegedly compiled by a person named Kevin Meadows, who transmitted them to the Company's executive officers.

Plaintiffs assert that "[f]rom June through October 2000, it was apparent from the monthly reports that HHT was falling increasingly short of its financial goals." Further, Plaintiffs contend that by October 2000, "it was already apparent that the integration of the lower-end and upper-end limited service hotels was not achieving economies of scale, and that the Lessee was operating at a loss." *Id.* at

¶ 44(a). The crux of Plaintiffs' claim is that Defendants had access to reports that indicated the poor financial condition of the Lessee (and therefore, of the Company); that Defendants misrepresented and failed to disclose that information; and that as a result, Defendants' representations concerning the Company's financial condition were misleading.

Finally, Plaintiffs claim that Defendants Schulte, Borgmann, and Humphrey had the motive and opportunity to "intentionally or recklessly" make false and misleading statements. Plaintiffs support this assertion with allegations that (1) Defendants had full access to complete and current information about the performance of the hotels and Lessee; (2) Defendants had personal financial incentives to make the merger appear "to be a success for as long as possible;" (3) Defendant Humphrey, as majority shareholder in Lessee, had an interest in protecting it and preventing the Company from canceling the leases; and (4) Defendant Borgmann sold 40,000 shares of HHT stock, representing about 5% of his holdings, on the market during February and/or March 2001, before the stock price dropped at the end of March.

## II. APPLICABLE LEGAL STANDARDS

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering such a motion, the court is required to accept as true all well-pled allegations in the Complaint, and to construe the facts and reasonable inferences from those facts in the light most favorable to the plaintiff. *See, Ibarra v. United States*, 120 F.3d 472, 473

(4th Cir.1997). "To survive a motion to dismiss, Plaintiff[s] must have alleged facts that show that they are entitled to relief on their substantive causes of action." *In re Criimi Mae, Inc. Securities Litigation,* 94 F.Supp.2d 652, 656 (D.Md.2000).

To prevail on a claim under § 10(b) and Rule 10b–5, a plaintiff must prove that (1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages. See, *Phillips v. LCI International Inc.,* 190 F.3d 609, 613 (4th Cir.1999) (*citing Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 208 (4th Cir.1994)).

A complaint stating causes of action pursuant to § 10(b) and Rule 10b–5 must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA" or "the Act"), 15 U.S.C. § 78u–4, *et seq.* "To satisfy the requirements of Rule 9(b) as to falsity, a section 10(b) plaintiff must: (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." *Meckenstock v. International Heritage, Inc.,* No. 5:98–CV–237 BR(2), 1998 U.S. Dist. LEXIS 21042, *9 (E.D.N.C. December 9, 1998).

In enacting the PSLRA, Congress substantially strengthened the liability protections and heightened the pleading requirements in private securities fraud lawsuits. See, *In re Manugistics Group, Inc., Securities Litigation,* NO. CIV. S 98–1881, 1999 WL 1209509, at *1 (D.Md. August 6, 1999). First, plaintiffs must show that they have specific facts that defendants have committed fraud, and must "specify the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Where allegations are made on information and belief, the Act requires plaintiffs to "state with particularity all facts on which that belief is formed." *Id.* Second, the Act created a "Safe Harbor" for forward-looking statements, meaning that such statements are immunized from liability if they are immaterial or are accompanied by "meaningful cautionary statements." 15 U.S.C. § 78u–5(c)(1)(A). Finally the PSLRA requires that plaintiffs plead with particularity all facts giving rise to a "strong inference" that each defendant acted with scienter. 15 U.S.C. § 78u–4(b)(2). A complaint that does not meet the Act's heightened pleading requirements shall be dismissed. 15 U.S.C. § 78u-(b)(3)(A).

## III. DISCUSSION

The Fourth Circuit, both before and after the enactment of the PSLRA, has made clear that " '[s]oft,' 'puffing' statements ... generally lack materiality because the market price of a share is not inflated by vague statements predicting growth." *Raab v. Gen. Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993) (*citing Howard v. Haddad,* 962 F.2d 328 (4th Cir. 1992)). *See also, Longman v. Food Lion, Inc.,* 197 F.3d 675, 685 (4th Cir.1999), *cert. denied,* 529 U.S. 1067, 120 S.Ct. 1672, 146 L.Ed.2d 482 (2000). Accordingly, many of the statements cited by Plaintiffs are not actionable because they are the kind of general statements of pride and optimism upon which reasonable investors would not rely. Such statements include, but are not limited to, the following: all but the last sentence of the excerpt from the second November 15, 2001 press release (infra p. 4–5); the entire first paragraph of the excerpt from the website (infra p. 6); the website statement that, "[w]e look forward to pursuing growth that ... for our shareholders;" and the first paragraph of the excerpt from the March 2, 2001 press release (infra p. 7).

In addition, "projections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *Raab*, 4 F.3d at 290 (*citing Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir.1993)). The *Raab* Court explained the reasoning underlying this principle:

> Predictions of future growth stand on a different footing, however, because they will almost always prove to be wrong in hindsight. If a company predicts twenty-five percent growth, that is simply the company's best guess as to how the future will play out. As a statistical matter, twenty percent and thirty percent growth are both nearly as likely as twenty-five. If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty. Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws, and we decline to endorse it.

*Id.* at 290. Several of the forward-looking statements cited by Plaintiffs fall under this category, and are therefore not actionable. They include:

— "This new lease structure should improve monthly cash flow ...". Third press release of November 15, 2001;

— "The Company does not expect these changes to adversely affect future cash flow and does not anticipate any change in the current dividend. 'Both the Company and the Lessee will benefit from the new lease and service agreements, as the interests of the owner and manager converge and we concentrate more on hotel profitability and faster hotel acquisition growth,' said [Schulte]." *Id.;*

— "While market conditions remain challenging, we expect to maintain our current dividend rate." March 2, 2001 press release.

— "13% Anticipated Return." Website excerpt.

— The "Outlook" paragraph from the website excerpt.[3]

These statements are similar to other forward-looking statements about a company's intent or expectations that courts in this circuit have found to be immaterial. *See, e.g., Genna v. Potts*, Civ. A. No. HAR 94–3260, 1995 WL 222043, at *4 (D.Md. April 13, 1995) (company's statements that, *inter alia*, "we ... feel that the current monthly dividend level ... will be sustained" were immaterial); *In re USF & G Corp. Sec. Litig.*, No. B–90–2928, 1993 WL 740188 at *6–7 (D.Md. February 11, 1993), *aff'd*, 16 F.3d 411 (4th Cir.1994). *See also Hershfang v. Citicorp*, 767 F.Supp. 1251, 1256 (S.D.N.Y.1991) (expectation of "a customary dividend increase" was not material).

In addition, Defendants argue that many of the statements in question are immune from liability under the Safe Harbor provision of PSLRA, because they are accompanied by cautionary statements.[4] The Court agrees. Cautionary language is "meaningful" if it conveys "substantive information about factors that realistically

---

**3.** Although this paragraph contains some statements about the Company's present situation, when taken as a whole it constitutes a forward-looking statement of the Company's goals and expectations. *See, Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir.1999).

**4.** Defendants also assert that the statements are protected under the bespeaks caution doctrine. The Court need not reach this argument.

could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business." H.R. Conf. Rep. No. 104–369 (1995) at 43, reprinted in 1995 U.S.C.C.A.N. 730. HHT's press releases contained the following warning:

> Certain matters within this press release are discussed using forward-looking language as specified in the [PSLRA], and, as such, may involve known and unknown risks, uncertainties and other factors that may cause the actual results or performance to differ from those projected in the forward-looking statement. These risks are discussed in the Company's filings with the [SEC].

▮▮▮ The Company's most recent Form 10–K, filed with the SEC on March 29, 2000, cautioned investors of specific risks that could affect cash flow and dividend payments.[5] In particular, the cautionary statement discussed factors that could affect the Lessee's ability to make lease payments, and consequently, the Company's ability to make distributions to shareholders. Despite Plaintiffs' argument to the contrary, SEC filings incorporated by reference are adequate to invoke the Safe Harbor provision for forward-looking statements. *See, In re CIENA Corp. Sec. Litig.*, 99 F.Supp.2d 650, 661 (D.Md.2000); *Harris v. IVAX Corp.*, 998 F.Supp. 1449, 1454 n. 4 (S.D.Fla.1998), *aff'd*, 182 F.3d 799 (11th Cir.1999).

▮▮▮ Finally, Plaintiffs have failed to allege particularized facts that show Defendants had actual knowledge that the forward-looking statements were false when made—"the substantive standard they must meet to blow the statements out of the safe harbor." *In re CIENA*, 99 F.Supp.2d at 661–62. This failure of pleading also applies to many of the statements about the Company's current situation. Plaintiffs' allegations that Defendants had actual knowledge consist largely of conclusory statements about what the Flash Reports "must have indicated" about the Company's financial health, and that the Defendants "must have known" that their statements were misleading as a result. For example, Plaintiffs assert that "[f]rom June through October 2000, it was apparent from the monthly reports that HHT was falling increasingly short of its financial goals," and that by October 2000, "it was already apparent that the integration of the lower-end and upper-end limited service hotels was not achieving economies of scale, and that the Lessee was operating at a loss." Amended Complaint at ¶ 44(a). These assertions, without more particularized facts to show what Defendants knew, when and how they knew it, and how their knowledge rendered particular statements false or misleading, fail to meet the stiff pleading requirements of the PSLRA. *See*, 15 U.S.C. § 78u–4(b)(1).[6]

---

5. Although the SEC forms were not attached to the Complaint, the Court may take judicial notice of them. *See, Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir.1999).

6. Furthermore, it is a close question whether any of the statements were misleading at all in light of the "total mix" of information available to investors at the time the statements were made. Many of the statements made by the Company during the Class Period, both those quoted by Plaintiffs and other

statements, such as the Company's financial statements (which showed significant cash losses at the end of 1999 and 2000), disclose unfavorable information about the Company's financial situation. Allegedly fraudulent corporate statements must be examined in context and in light of the "total mix" of information made available to investors. *Phillips*, 190 F.3d at 615 (*citing Basic v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

Were this Court to find that Plaintiffs had met those pleading requirements, however, the Amended Complaint would still merit dismissal, because Plaintiffs have failed to allege facts that adequately plead scienter. Although the Fourth Circuit has not dictated a standard by which plaintiffs must plead scienter under the PSLRA, the court did provide a helpful discussion of the issue in *Phillips v. LCI International Inc.*, 190 F.3d 609 (4th Cir. 1999), which merits repeating here:

> The PSLRA did not change the standard of proof a plaintiff must meet or the kind of evidence a plaintiff must adduce to demonstrate scienter at trial in a securities fraud case. Thus, to establish scienter, a plaintiff must still prove that the defendant acted intentionally, which may perhaps be shown by recklessness. But in order to "prevent abusive and meritless lawsuits," the PSLRA does seek to heighten the standard for pleading scienter, and so "chang[es] what a plaintiff must plead in his complaint in order to survive a motion to dismiss."
>
> The PSLRA directs that a complaint must, "with respect to each act or omission alleged to violate the chapter, state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." Nowhere does the PSLRA define this "required state of mind." Hence, although the new statute indisputably seeks to make pleading scienter more difficult for plaintiffs, there is "widespread disagreement among courts as to the proper interpretation of the PSLRA's heightened pleading requirement."
>
> The legislative history of the PSLRA refers to the Second Circuit standard. "The Conference Committee language is based in part on the pleading standard of the Second Circuit." That standard recognized that a plaintiff may plead scienter by alleging specific facts that either (1) constitute circumstantial evidence of conscious or reckless behavior or (2) establish a motive to commit fraud and an opportunity to do so. Some courts have held that the PSLRA adopted the Second Circuit's test for pleading scienter.
>
> Other courts, however, relying on further discussion in the PSLRA'S legislative history have interpreted the PSLRA as instituting an even more stringent standard.... [The court goes on to examine some of these other decisions.]
>
> We have not yet determined which pleading standard best effectuates Congress's intent. Nor need we do so here because the stockholders have failed to allege facts sufficient to meet even the most lenient standard possible under the PSLRA, the two-pronged Second Circuit test.

*Phillips*, 190 F.3d at 620–21 (citations omitted).

As in *Phillips*, Plaintiffs in this action have failed to meet either of the two prongs of the Second Circuit test. First, as discussed above, Plaintiffs have failed to allege facts sufficient to show that many or all of the statements were false. Clearly, to the extent that Plaintiffs have failed to show that the statements were false, they have also failed to create an inference-strong or otherwise-that Defendants knew or should have known they were false. *See, Phillips* at 621 (*quoting San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 813 (2d Cir.1996)).

Assuming, *arguendo*, that any of the statements were false or misleading, however, Plaintiff has also failed to plead facts sufficient to show circumstantial evidence of Defendants' conscious or reckless effort to defraud. Recklessness in this context has been defined as behavior "so highly

unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips*, 190 F.3d at 621 (*quoting Hoffman v. Estabrook & Co.*, 587 F.2d 509, 517 (1st Cir.1978)). Plaintiffs have not pleaded particularized facts to show that, when the November 2000 and March 2001 statements were made, Defendants knew, for example, that the merger would adversely affect cash flow and require a decrease in the dividend, and that a 13% return and maintenance of the dividend rate were not possible. Viewing all facts in the light most favorable to Plaintiffs, the Court cannot infer that Defendants acted with fraudulent intent or an "extreme departure" from ordinary care, in an effort to inflate the price of HHT stock.

█ Plaintiffs also fail to satisfy the second prong of the test. Defendants do not dispute that they may very well have had an "opportunity" to defraud, as they had access to the Company's financial information as executive officers. Plaintiffs' allegations of motive, however, stand on very thin ice. In order to demonstrate motive, Plaintiffs must show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994). Often, plaintiffs demonstrate motive by showing that defendants sold their stock in the company at suspicious times. *See, In re CIENA*, 99 F.Supp.2d at 663; *In re E.Spire Communications, Inc. Sec. Litig.*, 127 F.Supp.2d 734, 742 (D.Md. 2001). *Accord, San Leandro Emergency Med. Group Profit Sharing Plan*, 75 F.3d

at 814 (complaint did not plead strong inference of scienter where some defendants did not sell stock).

█ Plaintiffs rest their allegations of motive almost entirely on the fact that one Defendant, Mr. Borgmann, sold 5% of his holdings in the Company during the Class Period. Amended Complaint at ¶ 43. The Court finds this evidence woefully insufficient for several reasons. First, the other two Defendants did not sell *any* stock during the Class Period; in fact, Defendant Schulte, who is the only Defendant alleged to have actually made the statements in question, *purchased* over 20,000 shares during the class period.[7] Courts have found that where some defendants did not profit from the alleged fraud, any inference of scienter is negated as to all the defendants. *See, e.g., In re CIENA*, 99 F.Supp.2d at 663; *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir.1999). A defendant's purchase of stock also undermines an inference of scienter. *See, In re First Union Corp. Sec. Litig.*, 128 F.Supp.2d 871, 899 (W.D.N.C.2001). Furthermore, Defendant Borgmann's stock sale was relatively small, as compared to other defendants whose sales were found to be such small percentages of their holdings as to not be suspicious. *See, In re CIENA*, 99 F.Supp.2d at 663 (27.7% of holdings); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir.1999) (7.7% of holdings); *In re Advanta*, 180 F.3d at 540 (5% and 7% of holdings).

█ Finally, Plaintiffs' remaining allegations of motive are similarly misplaced. That Defendants wanted "to make the merger appear to be a success for as long as possible;" that they feared "they would lose their positions" if the merger looked

---

7. Although Plaintiffs do not mention the purchase in their complaint, the Court may take judicial notice of Defendants' trading reports filed with the SEC. *See, Greebel*, 194 F.3d at 198. Plaintiffs do not dispute Defendant Schulte's stock purchase.

like a failure; and that they desired to "protect their executive positions and the substantial compensation and prestige they obtained thereby," merely state the obvious: Defendants wanted the Company (and themselves) to do well. Hopefully, all corporate executives share this desire. When "stockholders' allegations pertain to motivations common to every corporat[ion], those allegations cannot demonstrate scienter." *Phillips*, 190 F.3d at 623. Finally, any evidence of Defendant Humphrey's additional motive to protect the Lessee (in which he had majority ownership) is undercut by the fact that Defendant Humphrey did not sell any stock and is not alleged to have made any of the statements in question during the Class Period.

 Accordingly, the Court finds that Plaintiffs have failed to state a claim under § 10(b) of the Securities Exchange Act of 1934 (Count I). Failure to state a claim for a primary securities fraud violation precludes a finding of control person liability under § 20(a) of the Act (Count II). *See, In re Criimi Mae*, 94 F.Supp.2d 652, 662 (D.Md.2000). Therefore, Count II will be dismissed as well.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss will be granted in full. A separate order will issue.