**In re E.SPIRE COMMUNICATIONS, INC. SECURITIES LITIGATION**

**Civil No. H–00–1140.**

United States District Court, D. Maryland.

Jan. 29, 2001.

Jeffrey C. Block, and Berman, DeValerio & Pease, LLP, Boston, Massachusetts and Charles J. Piven, Baltimore, MD, for plaintiffs.

John Missing, Ronit Setton and Brobeck, Phleger & Harrison, LLP, Washington, DC for defendants e.spire Communications, Inc., Anthony Pompliano, Douglas Hudson, David L. Piazza.

Richard A. Spehr, Kerry Lynn Edwards and Mayer, Brown & Platt, Washington, DC for defendants ING Equity Partners, L.P.I., Benjamin P. Giess, Olivier L. Trouveroy.

ALEXANDER HARVEY, II, Senior District Judge.

This is a securities fraud class action brought on behalf of shareholders who purchased common stock of e.spire Communications, Inc. ("e.spire" or "the Company") between August 12, 1999 and March 30, 2000 ("the Class Period"). Besides e.spire, the lead plaintiff has named as defendants in his consolidated and amended class action complaint ("the Complaint") officers and directors of the Company and a minority shareholder known as ING Equity Partners, L.P.I. ("ING"). Claims have been asserted under §§ 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t–1 and under Rule 10b–5 promulgated thereunder. 17 C.F.R. § 240.10b–5. Jurisdiction exists under 28 U.S.C. § 1331.

Presently pending before the Court are two separate motions to dismiss the Complaint. These motions have been filed under the Private Securities Litigation Reform Act of 1995 ("the PSLRA") and under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. One motion has been filed by defendants e.spire, Anthony J. Pompliano ("Pompliano"), David L. Piazza ("Piazza") and Douglas R. Hudson ("Hudson") (collectively "the e.spire defendants"). The second motion has been filed by defendants ING, Benjamin P. Giess ("Giess") and Olivier L. Trouveroy ("Trouveroy") (collectively "the ING defendants").[1] Extensive memoranda and exhibits in support of and in opposition to these pending motions have been filed by the parties. A hearing on the motions has been held in open court.

■ Although the parties and the Court in this Opinion have relied on facts established by documents which did not form a part of the complaint, the pending motions will be treated as motions to dismiss rather than as motions for summary judgment.

---

1. Pompliano, Piazza, Hudson, Giess and Trouveroy will be referred to collectively herein as "the individual defendants."

In deciding a motion to dismiss a securities fraud complaint, a court is entitled to rely on public documents quoted by, relied upon, incorporated by reference in, or otherwise integral to the complaint, and such reliance does not convert such a motion into one for summary judgment. *In re MicroStrategy, Inc. Securities Litig.*, 115 F.Supp.2d 620, 623 n. 4 (E.D.Va.2000). Reliance on documents of this sort is particularly appropriate when, as here, the parties do not challenge the authenticity of the documents. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir.1999).

## I

### Procedural History

On April 19, 2000, Mitchell Kranes filed the first of the ten securities fraud suits which are now pending in this Court and which seek a recovery from the e.spire defendants under §§ 10(b) and 20(a) of the Exchange Act and under Rule 10b–5. *Kranes v. Pompliano, et al.*, Civil No. H–00–1140. Nine more actions were thereafter filed by different e.spire stockholders.[2] On August 8, 2000, this Court entered an Order consolidating these ten pending class actions which have now been docketed as Civil No. H–00–1140 (Consolidated).

In its Memorandum Opinion of August 15, 2000, this Court ruled on three separate motions for the appointment of a lead plaintiff or lead plaintiffs and for the approval of a selection of lead counsel. Those motions had been filed pursuant to § 21D(a)(3) of the Exchange Act, as amended, 15 U.S.C. § 78u–4(a)(3). For the reasons stated in its Opinion, the Court granted the motion of Thomas Gleason for appointment of lead plaintiff and to appoint lead counsel and denied the other two similar motions.[3] The Court's Order of August 15, 2000 directed lead counsel to file a consolidated amended complaint within thirty days. The Complaint was thereafter timely filed. *Inter alia*, it added as defendants ING, Giess and Trouveroy, and also added a claim under § 20A of the Exchange Act.

Count I of the Complaint asserts a claim against all defendants under § 10(b) and Rule 10b–5. Count II seeks a recovery under § 20(a) against the individual defendants and ING. Count III asserts a claim against defendants Pompliano, Hudson and ING under § 20A of the Exchange Act.

## II

### Background Facts

A Delaware corporation, defendant e.spire was formed in 1993 and had its principal place of business in Annapolis, Maryland during most of the Class Period. On February 24, 2000, e.spire moved its headquarters to Herndon, Virginia.

e.spire provides telecommunications services to businesses, including local and long distance voice, data transmission, internet and web hosting services. The Company also designs and constructs high speed advanced fiber optic networks through its wholly owned subsidiary, ACSI Network Technologies ("ACSI"). e.spire operates and maintains local fiber optic networks in thirty-five markets throughout the United States.

Defendant Pompliano was Chairman of the Board of e.spire and Chief Executive Officer from 1993 until his resignation on December 31, 1999. Defendant Piazza was

---

**2.** In addition to the *Kranes* suit, the other nine class actions are as follows: *Pludo v. E.Spire Communications, Inc., et al.*, Civil No. H–00–1169, *Klein v. Pompliano, et al.*, Civil No. H–00–1212, *Kulak v. Pompliano, et al.*, Civil No. H–00–1371, *Daniels v. Pompliano, et al.*, Civil H–00–1373, *Schneider v. Pompliano, et al.*, Civil No. H–00–1420, *Tauber, et al. v. Pompliano, et al.*, Civil No. H–00–1421, *Market Street Securities, Inc. v. Pompliano*, Civil No. H–00–

1556, *Pirraglia v. Pompliano, et al.*, Civil No. H–00–1833, and *Andrews v. Pompliano, et al.*, Civil No. H–00–1924.

**3.** By Memorandum and Order dated September 6, 2000, the Court denied the motion for reconsideration filed by the so-called Matassa Group.

Chief Financial Officer from March 24, 1997 until he resigned on October 28, 1999. Defendant Hudson joined e.spire in May of 1994 and is President of ACSI. A limited partnership, defendant ING owned substantial shares of e.spire stock from 1995 until November 5, 1999, when it distributed most of its stock to certain partners.[4] Defendants Giess and Trouveroy were managing partners of ING who served as members of the e.spire Board of Directors from June of 1995 until their resignations on October 29, 1999.

It is alleged in the Complaint that during the Class Period, e.spire and certain of its senior officers and directors engaged in a common course of conduct which operated as a fraud on the integrity of the market for e.spire common stock by intentionally and recklessly utilizing improper accounting methods in violation of Generally Accepted Accounting Principles ("GAAP") in order to materially overstate e.spire's earnings for 1999. According to the Complaint, e.spire incorrectly recognized revenues derived from long term leases and failed to establish necessary financial reserves on a timely basis. It is alleged that as a consequence, all named plaintiffs and other class members who purchased e.spire common stock at artificially inflated prices during the Class Period were damaged on March 30, 2000. On that date, the price of the stock began to decline after e.spire announced that it was reducing its stated 1999 revenues by $12,300,000 in order to comply with prevailing industry accounting practices. By the time that the market closed the following day, the price of e.spire's common stock had decreased by almost 33% from its closing price on March 29, 2000.

According to the Complaint, defendants' misconduct fraudulently affected how the market valued the network technologies segment of e.spire's business.[5] The network technologies segment included revenue of e.spire's subsidiary ACSI which derives much of its revenue from entering into so-called Indefeasible Rights of Use ("IRUs").[6] During the Class Period, the entire amount of revenue which e.spire was to receive from each IRU was recorded upon delivery of the leased portion of the fiber optic network rather than ratably over the life of the lease.

In June of 1999, which was prior to the beginning of the Class Period, the Financial Accounting Standards Board (the "FASB")[7] issued Financial Accounting Standards Interpretation No. 43 ("FIN 43"), which was entitled "Real Estate Sales: An Interpretation of FASB Statement No. 66." The Complaint alleges that FIN 43 dictated that revenues resulting from certain of ACSI's lease and IRU transactions should have been deferred and should have been recognized ratably over the life of the lease or the IRU instead of, as was e.spire's policy during the Class Period, immediately upon delivery. The Complaint gave as an example that, if a customer paid $10,000,000 for the use of a fiber optic network over five years, then e.spire should have recorded $2,000,000 per year for five years.

A second accounting impropriety was also charged in the Complaint. The Complaint challenges the manner in which

4.  ING is a limited partnership comprised of a single general partner (which is itself a limited partnership) and a number of limited partners. Before the Class Period, ING owned 16.4% of e.spire common stock.

5.  For 1998, e.spire reported revenue for two main lines of business, namely, telecommunications and network technologies. The telecommunications segment reported revenue of $127.3 million and the network technologies segment reported revenue of $29.4 million.

6.  IRUs are leases of parts of the e.spire fiber optic network.

7.  Since 1973 the Financial Accounting Standards Board has been the designated organization in the private sector for establishing standards of financial accounting and reporting. Those standards govern the preparation of financial reports and are officially recognized as authoritative by the Securities and Exchange Commission.

e.spire recorded revenue from reciprocal compensation agreements ("RCAs") entered into between e.spire and incumbent local exchange carriers ("ILECs"). Pursuant to such RCAs, the Company would charge ILECs for the transport and termination of local telephone calls made by ILEC customers on e.spire's fiber optic network. It is alleged that e.spire recorded $17.7 million of revenue from RCAs entered into with ILECs in 1998 and that e.spire continued to record all of such RCA revenue in 1999 without adequately reserving for known collectibility and/or enforcement problems arising as a result of these contracts.

On August 12, 1999, e.spire issued a press release announcing increased revenues and earnings for the second quarter of 1999. These financial results were repeated in e.spire's SEC form 10–Q for the second quarter of 1999 ("Second Quarter 10–Q"), which was filed on August 16, 1999 and which was signed by defendants Pompliano and Piazza. The Second Quarter 10–Q stated that "In June, 1999, the FASB issued [FIN 43] which is effective for all transactions entered into after June 30, 1999" and that the Company "is currently assessing the impact of this interpretation and such impact could be significant."

On October 28, 1999, the Company issued a press release announcing positive financial results for the third quarter of 1999. This press release noted that "e.spire's wholly owned, fiber optic construction subsidiary posted record results with a revenue contribution of $22,000,000, up 92% from the year ago period." The Company's SEC Form 10–Q for the third quarter of 1999 ("Third Quarter 10–Q") was filed on November 15, 1999 and was signed by defendant Pompliano. In pertinent part, e.spire's Third Quarter 10–Q stated:

Under FIN 43, sales, capital leases, and indefeasible rights of uses ("IRUs") of dark fiber, conduit and capacity related to fiber optic cable systems may be required to be accounted for under FASB No. 66 based upon the terms of the transaction and, components of asset involved. [e.spire] believes that its sales, capital leases, and IRUs of dark fiber, conduit and fiber optic cable systems, to the extent title is transferred, will continue to meet the criteria for sales type lease accounting. Although management believes that FIN 43 will not have any effect on its cash flows and should not have a material effect on its accounting policies, consolidated financial condition or results of operations, accounting practice and authoritative literature guidance is currently evolving in the industry, accounting profession and regulatory authorities, with resolution expected within the next several months.

\*　　\*　　\*　　\*　　\*　　\*

[e.spire's] current revenue recognition policies for [ACSI] could be adversely affected by the final resolution of FIN 43.

The Third Quarter 10–Q also stated that potential problems existed with respect to the collection of past due payments from ILECs under RCAs with e.spire.

On March 30, 2000, e.spire issued a press release which stated in pertinent part:

To comply with prevailing industry accounting practices, [FIN 43] and the guidance of the Company's independent auditors, e.spire adopted FIN 43, the operating lease method of revenue recognition for dark fiber sales... The adoption of FIN 43 resulted in a $12.3 million reduction in the company's estimated 1999 revenues.

The Company also reported in this press release that, based upon a state by state analysis of its RCAs, it would establish incremental reserves totaling $8.7 million as of December 31, 1999. The Company further stated that it was not in compliance with certain debt covenants due to its financial results for the fourth quarter of 1999. Following issuance of this press release, the price of e.spire stock de-

creased almost 33% from a closing price of $10.438 per share on March 29, 2000 to a closing price of $7.031 per share on March 31, 2000.

On April 14, 2000, e.spire filed SEC Form 10–K, in which it reported financial results for the year ended December 31, 1999. On May 12, 2000, e.spire restated its financial results for the third quarter of 1999 by filing SEC Form 10–Q/A which adjusted revenue downward by almost $2.4 million for the third quarter.

## III

### Applicable Principles of Law

■ It is well established that a motion to dismiss filed pursuant to Rule 12(b)(6), F.R.Civ.P., will not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). However, in a case involving allegations of securities fraud, a complaint must satisfy other significant requirements. First, Rule 12(b)(6) must be read in conjunction with Rule 9(b) which requires that in all averments of fraud the circumstances constituting fraud or mistake shall be stated "with particularity." Particularity of pleading is required with regard to the time, place, speaker and contents of the allegedly false statement, as well as the manner in which the statement is false and the specific facts raising an inference of fraud. *Gollomp v. MNC Fin., Inc.,* 756 F.Supp. 228, 232 (D.Md. 1991). This requirement of pleading with particularity provides defendants with fair notice of the plaintiff's claims, protects defendants from harm to their reputation or good will and reduces the number of strike suits. *Id.* As Judge Motz noted in *Gollomp,* the Rule 9(b) pleading requirement is designed to prevent a plaintiff, acting on suspicion, from using the fraud suit itself as the vehicle for initially uncovering the fraud. *Id.*

Second and even more important here, the PSLRA imposes significant pleading requirements on plaintiffs in securities fraud actions. Under the PSLRA, a complaint must "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). As Judge Smalkin noted in *In re Manugistics Group, Inc.* (1999 WL 1209509 at *1) (D.Md.1999):

> In enacting the PSLRA, Congress clearly intended to cut back the ease with which shareholders, through federal class action suits, could hold corporations and their officers at legal swordpoint, with resultant settlements netting millions for plaintiffs' lawyers, but pennies for their clients. The means Congress chose to achieve that goal was to tighten up pleading and practice in such suits, including the establishment of lead counsel procedures, and, as relevant here, heightened standards of claim pleading, above and beyond the simple factual statement otherwise required by Civil Rule 8, and even the more specific allegations of fraud required to be pleaded under Rule 9.

Within the last eighteen months, three judges of this Court have dismissed class action suits alleging claims of securities fraud. In *Manugistics,* Judge Smalkin applied the PSLRA's "heightened standards of claim pleading" and dismissed a class action securities fraud suit brought under the Exchange Act. *In re Criimi Mae, Inc. Securites Litigation,* 94 F.Supp.2d 652 (D.Md.2000), similarly involved claims brought under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b–5. In granting defendants' motion to dismiss the amended and consolidated class action complaint, Judge Chasanow applied the pleading standards of Rule 9(b) and the PSLRA and concluded that plaintiffs had failed to allege sufficient facts to raise a strong inference that defendants knew, or were reckless in not knowing, that the

allegedly misleading statements were materially false or misleading when made. *Id.* at 662. In *In re CIENA Corporation Sec. Litig.*, 99 F.Supp.2d 650 (D.Md.2000), Chief Judge Motz had before him a securities fraud class action brought against Ciena Corporation and several of its officers. In granting defendant's motion to dismiss the second amended complaint, Judge Motz determined that plaintiffs had failed to allege specific facts which would satisfy the standard for pleading scienter established by the PSLRA. *Id.* at 664.

## IV

*Count I—Section 10(b) and Rule 10b–5*

To establish liability under § 10(b) of the Exchange Act and Rule 10–b(5), a plaintiff must allege that (1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which plaintiff justifiably relied (4) that proximately caused plaintiff's damages. *Phillips,* 190 F.3d at 613 (quoting *Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 208 (4th Cir.1994)). The Supreme Court has defined scienter as "a mental state, embracing intent to deceive, manipulate or defraud." *Ernst v. Hochfelder,* 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Under the Fourth Circuit's *Phillips* decision, plaintiffs in this case must show that defendants acted with scienter, namely that they "acted intentionally, which may perhaps be shown by recklessness." *Id.* at 620. By requiring that a plaintiff state with particularity facts giving rise "to a strong inference" that a defendant acted with the required state of mind, the PSLRA raised the standard for pleading scienter. *CIENA,* 99 F.Supp.2d at 657.

Before the PSLRA was enacted, the Second Circuit had held that a plaintiff may plead a strong inference of scienter by proceeding under either one of two separate approaches. *In re Time Warner, Inc. Securities Litig.,* 9 F.3d 259, 268–69 (2d Cir.1993). The first approach was to allege facts establishing the motive to commit fraud and an opportunity to do so. *Id.* The second approach was to allege facts constituting circumstantial evidence of either reckless or conscious behavior. *Id.*

Following passage of the PSLRA, various courts have interpreted the statute's "strong inference" standard differently. In *Phillips,* the Fourth Circuit discussed the conclusions which various other courts have reached on the issue. *Phillips,* 190 F.3d at 620–21. However, in that case, the Fourth Circuit stated that it had "not yet determined which pleading standard best effectuates Congress' intent" but did conclude that "the most lenient standard possible under the PSLRA [is] the two pronged Second Circuit test." *Id.* at 621.

In this case, it is not necessary for this Court to determine the extent to which Congress intended that the PSLRA tighten the Second Circuit's pleading standard for scienter. On the record here, this Court concludes that the complaint fails to satisfy the two pronged Second Circuit test for scienter and that Count I of the Complaint must therefore be dismissed as to all defendants. The complaint, *a fortiori,* does not meet the more exacting requirements adopted by the First, Sixth and Eleventh Circuits which have held that motive and opportunity are never enough by themselves to create a "strong inference" of scienter. *See MicroStrategy,* 115 F.Supp.2d at 629.

Count I is based upon four allegedly misleading statements made by the defendants: (1) the August 12, 1999 press release, (2) the October 28, 1999 press release, (3) the Second Quarter 10–Q, and (4) the Third Quarter 10–Q. With respect to each of these statements, the Complaint fails to adequately explain why each statement was misleading and also fails to identify with particularity specific facts which would give rise to a strong inference that each named defendant acted with scienter.

■ The Complaint includes conclusory allegations that the statements in question

"were knowingly or recklessly misleading when made and omitted from disclosure material facts because ... defendants knew that they were not in compliance with GAAP and industry accounting standards with regard to certain lease and IRU transactions, even before the issuance of FIN 43 ...." The Complaint alleges that the basis for the individual defendants' knowledge of the Company's alleged non-compliance with GAAP was their positions as officers and/or directors of e.spire. Allegedly, their motive to make fraudulent statements was predicated upon their desire (1) to enhance their executive compensation and stock holdings, (2) to profit from insider trading, and (3) to comply with e.spire's debt covenants.

### (a)

### *Scienter—Motive and Opportunity*

The Second Circuit's standard for pleading scienter requires that a complaint must at least "allege facts establishing the motive to commit fraud and the opportunity to do so ... [or] allege facts constituting circumstantial evidence of either reckless or conscious behavior." *Time Warner*, 9 F.3d at 269. Under Fourth Circuit law, "[i]n order to demonstrate motive, a plaintiff must show 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" *Phillips*, 190 F.3d at 621 (*quoting Shields v. Citytrust Bancorp. Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994)). Opportunity entails the means and likely prospect of achieving concrete benefits by the means alleged. *Shields*, 25 F.3d at 1130. Here, because of their positions of power and authority, the individual e.spire defendants undoubtedly had the opportunity to issue fraudulent financial statements.[8] However, in a case of this sort, allegations regarding the defendants' motives must be examined more closely. *See e.g., Phillips*,

190 F.3d at 621–24; *In re Criimi Mae*, 94 F.Supp.2d at 660.

### (1)

### *Enhancement of Executive Compensation*

Plaintiffs argue that defendants in making the false statements in question were motivated by a desire to enhance their compensation and stock holdings. Allegations of this sort by themselves are insufficient to create "a strong inference of scienter," *In re Criimi Mae*, 94 F.Supp.2d at 660, because such allegations pertain to common motivations of corporate officers. *Phillips*, 190 F.3d at 623; *see also MicroStrategy*, 115 F.Supp.2d at 642–43.

To support a claim of motive to commit fraud based on the concrete benefit which a defendant would derive from an increase in the value of his holdings, a plaintiff must demonstrate some sale of "personally-held stock" or "insider trading" by the defendant. *Phillips*, 190 F.3d at 622 (citations omitted). Allegations of insider trading "may strengthen an inference of scienter where 'the trades were unusual in their timing or amount.'" *MicroStrategy*, 115 F.Supp.2d at 643 (*quoting In re Orbital Sciences Corp. Securities Litig.*, 58 F.Supp.2d 682, 686 (E.D.Va.1999)).

### (2)

### *Insider Trading*

Only defendants Pompliano and Hudson sold shares of e.spire common stock during the Class Period. It is alleged in the Complaint that defendants Pompliano and Hudson sold shares of e.spire common stock during the Class Period with knowledge of material, non-public, adverse information and that they realized proceeds therefrom.

In August 1999, defendant Pompliano sold 50,000 shares of stock worth approximately $451,000, and in November 1999, he sold another 103,000 shares worth almost $657,000. On August 23, 1999, defendant

---

**8.** Plaintiffs have not explained how any one of the ING defendants had the opportunity to

issue fraudulent financial statements.

Hudson sold 2,000 shares worth approximately $18,000. No sales of stock were made by defendants Piazza, Giess or Trouveroy during the Class Period.

■ Plaintiffs also rely on distributions made by defendant ING of a large number of shares of e.spire stock. On November 5, 1999, defendant ING made two separate distributions of stock to partners totaling 5,001,826 shares valued at almost $33 million. However, the transactions in question were distributions and not "sales" within the meaning of the Exchange Act. As such, they do not constitute proof of scienter on the part of defendant ING. There has been no showing that ING derived concrete benefits from these distributions. Plaintiffs argue that an ING partner who was one of the distributees promptly sold the stock in question and that such a sale is proof that ING had a motive to commit fraud. However, the partner in question has not been named as a defendant, and such partner's motives cannot be attributed to ING as proof of ING's fraudulent intent.

■ The mere pleading of insider trading without regard to either the context or the strength of the inferences to be drawn is not enough to support a strong inference of scienter. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir. 1999). The sale of merely some stock during the Class Period is not sufficient to give rise to an inference of fraudulent intent. *In re CIENA Corp.*, 99 F.Supp.2d at 663. On the record here, the Court concludes that the trades relied upon by the plaintiffs were not made in quantities which were suspicious enough to support a strong inference of scienter, particularly in light of the fact that none of the individual defendants are alleged to have personally made any misrepresentations. The profits reaped by Pompliano and Hudson are not substantial enough in relation to their compensation levels so as to produce a suspicion that they had an incentive to commit fraud.

In relying on the sales made by Pompliano and Hudson during the Class Period, plaintiffs have overstated the percentages of their stock holdings by omitting from their calculations the exercisable options held by these defendants. According to plaintiffs, Pompliano's August 1999 and November 1999 sales constituted 99.8% and 51.4% respectively of his holdings of e.spire stock at the time of each sale while defendant Hudson's August 1999 sale purportedly represented 15.7% of the e.spire stock which he then held. However, shares of stock held plus exercisable stock options represent the owners' trading potential more accurately than stock shares alone. *In re Silicon Graphics Inc. Securites Litigation,* 183 F.3d 970, 987 (9th Cir.1999). When Pompliano's and Hudson's total holdings are considered, the stock sales made by them during the Class Period represent at the time of each sale the following percentages of their combined stock and exercisable options: (1) Pompliano's August 1999 sale—2.92%, (2) Pompliano's November 1999 sale—6.20% and (3) Hudson's August 1999 sale—.66%.

These corrected percentages considerably weaken plaintiffs' attempt to adequately plead scienter by showing that defendants Pompliano and Hudson had a motive to profit from insider trading. As Judge Motz noted in *In re CIENA Corp.*, 99 F.Supp.2d at 663, the fact that an individual defendant sold so little stock can be construed as negating the inference that there was fraud.[9]

As noted, another fact which a court should consider in a case like this one is whether the alleged trades were normal and routine for the insider or whether they

**9.** Defendants' intent to defraud by way of a motive to profit from insider trading is further weakened by the fact that defendant Piazza, who was e.spire's Chief Financial Officer, did not sell any of his e.spire shares during the Class Period. *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995); *In re Burlington Coat Factory Securities Litig.,* 114 F.3d 1410, 1423–24 (3d Cir.1997).

were unusual in their timing or amount. *MicroStrategy,* 115 F.Supp.2d at 644; *Burlington,* 114 F.3d at 1424. The facts here do not support plaintiffs' contention that the timing and amounts of the sales made by Pompliano and Hudson were unusual and suspicious. Prior to the Class Period, both Pompliano and Hudson had sold large numbers of shares of stock. According to the Complaint, Pompliano sold 50,000 shares in May 1999, and that same month Hudson sold 12,350 shares.[10] Evidence that officers sold shares prior to the class period can undermine a plaintiff's claim that insider sales during the class period were unusual. *Lirette v. Shiva Corp.,* 27 F.Supp.2d at 283 n. 10 (citing *In re Glenayre Technologies, Inc. Securites Litigation,* 982 F.Supp. 294, 299 (S.D.N.Y. 1997)).

### (3)
### *Compliance With Debt Covenants*

Plaintiffs further argue that defendants had a motive to commit fraud in order to comply with e.spire's debt covenants. The Complaint alleges that e.spire had severe cash flow problems and that if it could not satisfy certain debt covenants within its $200 million Senior Secured Credit Facility, it would be unable to continue to borrow much needed funds to maintain its operations. However, a company's desire to maintain a high bond or credit rating does not qualify as a sufficient motive for fraud. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.,* 75 F.3d 801, 814 (2d Cir.1996). If scienter could be successfully pleaded on that basis alone, virtually every company in the United States experiencing a down turn in the price of its stock would be forced to defend securities fraud actions. *Id.* (citing *Acito,* 47 F.3d at 54).

Moreover, e.spire's Third Quarter 10–Q clearly stated that as of September 30, 1999, e.spire was not in compliance with the financial covenants contained in the

$200 million Senior Secured Credit Facility. Nevertheless, as the Complaint itself indicates, on July 17, 2000, more than three months after the allegedly fraudulent accounting practices had been revealed, e.spire was able to secure an amendment to the Credit Facility agreement which took the Company out of default. The probative value of defendants' alleged motive to commit fraud in order to comply with e.spire's debt covenants is considerably weakened by the fact that e.spire moved from non-compliance into compliance after the supposedly fraudulent conduct was disclosed. In other words, during the period of time when defendants were allegedly committing fraud to maintain compliance with their debt covenants, e.spire was actually in default, but after the alleged fraud came to light, e.spire was able to move out of default. These facts do not give rise to a strong inference that e.spire had a motive to commit fraud in order to comply with its debt covenants.

For all these reasons, this Court concludes that the allegations of the Complaint relied upon by plaintiffs in opposing defendants' motions to dismiss are not sufficient to raise a strong inference that defendants had a motive to commit fraud.

### (b)
### *Scienter—Reckless or Conscious Behavior*

Under the Second Circuit test, a plaintiff who has not sufficiently pled motive may meet his burden of showing scienter by alleging facts constituting circumstantial evidence of either reckless or conscious behavior. *Time Warner,* 9 F.3d at 268–69. However, when a defendant's motive to commit securities fraud is not readily apparent from a complaint, the plaintiff faces a more stringent standard for establishing fraudulent intent and must state with particularity facts giving rise to a strong inference of fraud based on conscious behavior or severe recklessness. *Coates v.*

---

**10.** The record here indicates that Hudson also sold 3,851 shares on February 26, 1999 and 10,000 shares on March 16, 1999, a total of 26,201 shares during the six months prior to the beginning of the Class Period.

*Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 920 (N.D.Texas 1998). The Fourth Circuit has held that a finding of recklessness must be based on "an act 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or was so obvious that the defendant must have been aware of it.'" *Phillips,* 190 F.3d at 621 (*quoting Hoffman,* 587 F.2d at 517).

It is alleged in the Complaint that defendants "caused [e.spire] to file financial statements during the Class Period that were materially false and misleading, which defendants knew or recklessly disregarded were not in conformity with GAAP." Specifically, it is asserted that defendants overstated revenue (1) by failing to recognize revenue from lease and IRU transactions ratably over the life of the lease or the IRU after the issuance of FIN 43 in June of 1999, and (2) by improperly recording as revenue amounts received from ILECs pursuant to RCAs even though ILECs were disputing charges and failing to make payments to e.spire.

The Complaint seeks to support its conclusory allegation that defendants' accounting practices recklessly violated GAAP by drawing inferences from three separate events: (1) the March 30, 2000, press release which announced that e.spire would adopt the "industry-wide accounting practice" for recognizing revenue from certain leases resulting in a $12.3 million reduction in estimated 1999 revenues and that e.spire would establish additional reserves totaling $8.7 million related to RCAs; (2) the May 12, 2000 restatement of e.spire's 1999 third quarter financial results that reduced third quarter revenue by almost $2.4 million; and (3) the May 15, 2000 conference call by e.spire's new management team in which the new Chief Executive Officer made comments about the manner in which e.spire would operate in the future.

(1)

*Alleged GAAP Violation of FIN 43 and Subsequent Restatement*

▮ That a restatement of financials occurred is not sufficient to raise a strong inference of scienter. It is settled that "scienter requires more than a misapplication of accounting principles," and that "[m]ere allegations that statements made in one report should have been made in earlier reports do not make out a claim of securities fraud." *MicroStrategy,* 115 F.Supp.2d at 634–35 (footnotes omitted); *see also In re Peritus Software Servs., Inc. Securites Litigation,* 52 F.Supp.2d 211, 223 (D.Mass.1999). Allegations of GAAP violations "might be sufficient" to plead scienter only where they are coupled with evidence of "corresponding fraudulent intent." *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000) (*quoting Chill v. General Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996)).

▮ Plaintiffs argue that three factors related to the alleged GAAP violation of FIN 43 provide supporting evidence of defendants' fraudulent intent: (1) the simplicity of the accounting rule that was violated; (2) defendants' knowledge of both the accounting rule in question and the possibility that it was being violated; and (3) the statement made by e.spire's current CEO less than two months after the Class Period ended.

FASB Statement No. 66 ("FAS 66") established standards for recognition of profit on all real estate sales transactions without regard to the nature of the seller's business. FAS 66 was amended by FASB Statement No. 13 (*Accounting for Leases*) ("FAS 13"), and FAS 13 was amended by FASB Statement No. 98 (*Accounting for Leases*) ("FAS 98"). Based upon the fact that FAS 66 applies regardless of the nature of the seller's business, plaintiffs have alleged the following in Paragraph 47 of the Complaint:

Industry practice and FAS Nos. 66, 98 and 13, issued long before June 30, 1999, dictated that revenues resulting from

certain of ACSI's lease and IRU transactions should have been deferred and recognized ratably over the life of the lease or IRU ... FIN 43 reiterated that such revenue in many instances should *not* be recognized immediately upon "delivery," which, as belatedly disclosed, was e.spire's accounting policy during the Class Period. Thus, any ambiguity as to whether FAS 66 applied to e.spire's accounting revenues for its leases and IRUs was eliminated by the adoption of FIN 43. (Emphasis in original).

However, FIN 43 did not "reiterate" the "industry practice." The introduction to FIN 43 states in pertinent part:

Although [FAS] 66 states that it is applicable to all sales of real estate, it does not explicitly define real estate or identify the real estate transactions to which it is specifically applicable. As a result, diversity developed in practice with regard to whether transactions involving the sale of real estate with property improvements or integral equipment such as manufacturing facilities, power plants, and refineries are subject to the sales recognition criteria of [FAS] 66. The FASB was asked to clarify how the phrase *all real estate sales,* as it is used in [FAS] 66, relates to those transactions. (Emphasis in original).

The assertion made in Paragraph 47 of the Complaint that FIN 43 reiterated the industry practice in question ignores the FASB's own understanding that diversity had developed in practice regarding FAS 66 because that statement did not define "real estate" or identify the transactions to which it was applicable. Moreover, the Complaint acknowledges that FIN 43, which was issued in June of 1999, was designed to apply prospectively to "all sales of real estate with property improve-

ments or integral equipment entered into after June 30, 1999." On the record here, this Court concludes that there is no merit to plaintiffs' assertion that "long before June 30, 1999" defendants should have recognized revenue from leases and IRUs ratably over the life of the lease or IRU, instead of immediately upon delivery.

Plaintiffs argue that "any ambiguity as to whether FAS 66 applied to e.spire's accounting revenues for its leases and IRUs was eliminated by the adoption of FIN 43." The Court must disagree. As noted, FIN 43 was designed to clarify how transactions involving the sale of real estate with "property improvements" or "integral equipment" should be recognized. However, as the e.spire defendants point out, FIN 43 acknowledges that "whether something is in substance real estate is a matter of judgment that depends on the relevant facts and circumstances." FIN 43 ¶ 12. There is no clear definition in FIN 43 of the terms "property improvements" or "integral equipment." [11] Examples given are "an office building, a manufacturing facility, a power plant, and a refinery," *Id.* ¶ 2. None of these examples have any obvious similarities to a fiber optic network. Accordingly, the language of FIN 43 which interprets the language of FIN 66 does not establish a simple accounting rule which defendants should have known they were violating.

Plaintiffs argue that the accounting rule announced by FIN 43 was clear on its face and should have been implemented at once. The Court must disagree. The parties agree that under FIN 43, if an IRU provided for the transfer of title, e.spire could recognize the revenue up front but if title did not transfer under provisions of the IRU, the revenue could not be recognized up front. The issue is a complex one

---

**11.** Paragraph 2 of the "Interpretation" Section of FIN 43 states:

The terms *property improvements* and *integral equipment* as they are used in this Interpretation refer to any physical struc-

ture or equipment attached to real estate that cannot be removed and used separately without incurring significant cost. (Emphasis in original).

which is not resolved by a mere reading of FIN 43.

Involved in the accounting decision in question is whether under an IRU there was a transfer of title to property with fiber optic material running through it. Many different factors are involved in determining whether a particular IRU between the parties contained provisions resulting in a transfer of title which would allow the revenue to be recognized and reported at the beginning of the lease. FIN 43 applied only to transactions entered into after June 30, 1999. In its Second Quarter 10–Q, e.spire stated that it was currently assessing the impact of FIN 43 on future IRUs and agreed that "such impact *could* be significant." (Emphasis added). Plaintiffs argue that this 10–Q should properly have stated that the impact "would" be significant. But obviously e.spire executives could hardly have made a final decision on the impact of FIN 43 before the Company had entered into IRUs after June 30, 1999. When at the end of the year the pertinent facts were known following a review of provisions of the IRUs, e.spire determined that title had not passed and that FIN 43 required that the revenue be spread over the life of the leases. Under the circumstances here, defendants' conduct can hardly be characterized as reckless.

Factors which a court may consider in determining whether in a case of this sort fraud has been adequately pled include the "number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] or restatement . . . ." *MicroStrategy*, 115 F.Supp.2d at 635. In this case, the size, timing and frequency of the misapplication and the context of the alleged violations considerably weaken any inference of defendants' intent to defraud. While total revenues for the third quarter 1999 were $65 million and total revenues for the entire year were $244 million, the third quarter restatement reduced revenues by only $2.4 million. This restatement amounted to only 3.7% of the Com-

pany's third quarter 1999 revenues and less than 1% of its revenues for the entire year. Moreover, the restatement affected only one quarter, and it was implemented quickly enough to avoid any problems with the statement of financial results for either the fourth quarter or the year. The Company's fourth quarter financial statement reflected the adoption of FIN 43. The Second Quarter 10–Q discussed FIN 43, noted that accounting practice and authoritative guidance was "currently evolving in the industry" and indicated that e.spire was "assessing the impact of [the FIN 43] interpretation and such impact *could be significant.*" (Emphasis added). The Third Quarter 10–Q provided both a description of how FIN 43 might be applied to e.spire's business and a warning that "[t]he Company's current revenue recognition policies for [ACSI] could be *adversely affected* by the final resolution of FIN 43." (Emphasis added). These additional factors decrease the weight to be given to the Complaint's conclusory allegations that defendants knowingly or recklessly failed to recognize certain revenue in accordance with FIN 43 and that they so acted in order to defraud investors by artificially inflating the price of e.spire's stock during the Class Period.

(2)

*Alleged GAAP Violation by Prematurely Recording RCA Revenue*

According to the Complaint, the defendants acted recklessly by recording revenue received from RCAs with ILECs without establishing any reserves, even though "a substantial number of state PUCs [Public Utilities Commissions] and other authorities had either not decided the issue yet or decided against the Company . . . ." Paragraph 50. These allegations ignore other significant facts. Prior to the Class Period, over 30 PUCs had previously ruled in favor of companies like e.spire. The decisions which had been adverse to e.spire addressed only future payments and not amounts which were past due under RCAs. The Company had previously

received payments from many ILECs, and, based upon a state by state analysis, e.spire increased its existing reserve to $8.7 million as of December 31, 1999.

As disclosed by the March 30, 2000 press release, the entire amount of $8.7 million was not being set aside as a reserve for the first time on December 31, 1999. This was an incremental addition to an existing reserve based on the Company's state by state analysis. The Company's action was not the establishment of the reserve in its entirety but was rather an increase in the reserve as of December 31, 1999 to the total amount of $8.7 million. Plaintiffs incorrectly contend that $8.7 million was being set aside as a reserve for the first time in the fourth quarter.

Moreover, both the Second Quarter 10–Q and the Third Quarter 10–Q provided explanations and cautionary statements with reference to the manner in which e.spire was recording revenue from RCAs with ILECs. The Second Quarter 10–Q stated that e.spire had revenue from ILECs pursuant to RCAs but it also disclosed that:

> [t]hese ILECS have not paid and have disputed the majority of these charges . . . To date, there have been no unfavorable final rulings concerning payment of past due reciprocal compensation amounts. . . . Although there can be no assurance that future regulatory rulings will be favorable . . . [e.spire] believes all of these amounts are ultimately collectible.

The Third Quarter 10–Q contained similar language as well as the following statement: "[e.spire] has obtained favorable rulings from the Georgia and Florida PUCs requiring payment of past due reciprocal compensation in those states, although those rulings have been appealed by the ILEC."

■ Corporate mismanagement, such as the failure to establish adequate reserves, is generally not sufficient to establish securities fraud. *See, e.g., Gol-*

*lomp*, 756 F.Supp. at 231 (determining that plaintiff failed to state a securities fraud claim based on defendant's failure to maintain adequate loan reserves absent any showing that the charged conduct necessarily resulted from deliberate intent to defraud or reckless disregard for the truth); *Shields v. Amoskeag Bank Shares, Inc.,* 766 F.Supp. 32, 36–38 (D.N.H.1991) (determining that allegations of corporate mismanagement are not sufficient to sustain a Rule 10b–5 case absent a showing of deception in management). The fact that a company did not increase its reserves fast enough is not evidence of fraud. *DiLeo v. Ernst & Young,* 901 F.2d 624, 626 (7th Cir.1990). Securities laws do not guarantee sound business practices. *Id.* at 627. Allegations of "fraud by hindsight" cannot meet the pleading standards required under the Exchange Act. *See, e.g., Raab v. General Physics Corp.,* 4 F.3d 286, 291 (4th Cir.1993) ("[H]indsight does not establish fraud. If it did, any drop in the price of shares would result in lawsuits from disappointed investors").

This Court concludes that plaintiffs cannot on the record here sufficiently support their assertions in the Complaint that defendants should have known (1) that FIN 43 would be applied to e.spire's leases and IRUs entered into after June 30, 1999 and (2) that e.spire should have earlier established adequate reserves because ILECs would continue to refuse to make payments due under RCAs. These assertions constitute fraud by hindsight and do not satisfy plaintiffs' burden under the PSLRA to adequately plead fraud.

### (3)

#### *Comments of the New CEO*

■ On May 15, 2000, George Schmitt, e.spire's new Chief Executive Officer, held a conference call during which he stated that he did not want to be critical of anybody who ran the company previously because he did not sit in their shoes at the time they were making their decisions. He added:

There is absolutely zero tolerance for any lying, cheating, or stealing, in any way, shape, or form here. And that includes any public statement, or any public information that I or anybody else gives out to you or to any other investor.

Plaintiffs rely on this statement as evidence that the individual defendants acted with scienter. Such reliance is misplaced. Merely alleging facts that lead to a "strained and tenuous" inference is insufficient to satisfy the pleading requirement. *Phillips*, 190 F.3d at 621 (citing *Zeid v. Kimberley*, 973 F.Supp. 910, 923 (N.D.Cal. 1997)). The new CEO made his comments after the Class Period had ended and after the *Kranes* suit had been filed against e.spire in this Court. It cannot be reasonably inferred that the new CEO was specifically referring to conduct of the individual defendants since his comments may have related to other intracorporate matters which had come to his attention. Speculative inferences should not be pieced together as evidence that a defendant had a true motive to commit fraud. *Phillips*, 190 F.3d at 623.[12]

(4)

*Failure to Plead GAAP Violations with Particularity*

As noted herein, to satisfy requirements for pleading scienter, a complaint must state with particularity facts giving rise to a strong inference of fraud based upon intent or recklessness. To establish recklessness, plaintiffs must allege facts showing that defendants' acts were so highly unreasonable and amounted to such an extreme departure from the standard of ordinary care as to present a danger of misleading plaintiffs to the extent that the danger was known to defendants or was so obvious that the defendants must have been aware of it. *Phillips*, 190 F.3d at 621 (citing *Hoffman*, 587 F.2d at 517). In this case, to the extent that defendants were aware that certain accounting practices might present problems, they took appropriate steps to satisfy the standard of ordinary care by providing cautionary statements relating to FIN 43 and also to their recognition of revenue from RCAs. When viewed in the context in which they were made including the related cautionary comments, the statements relied upon by plaintiffs were neither false nor misleading. *See, e.g., In re CIENA Corp.*, 99 F.Supp.2d at 658.

When considered in their totality, the particular statements at issue have not been shown to be probative of a cavalier and manipulative attitude toward disclosure requirements on the part of the executive officers of e.spire. *MicroStrategy*, 115 F.Supp.2d at 650. Here, as in *In re Crimi Mae*, some of the individual defendants held executive positions, some of them signed the allegedly false SEC filings, and all of them presumably had extensive experience and knowledge of the company's business. Yet, as Judge Chasanow held in that case, "[t]hese facts standing alone, are not sufficient to raise a strong inference of scienter." 94 F.Supp.2d at 662. If facts of this sort were sufficient, then every corporate executive who participates in the day-to-day management of his company would be exposed to liability for securities fraud. *Id.*

The facts alleged by plaintiffs in the Complaint do not show that defendants' acts were highly unreasonable nor that they amounted to an extreme departure from the standard of ordinary care under the circumstances. *Phillips*, 190 F.3d at 621. It cannot be said on the record here that defendants' conduct presented a danger of misleading plaintiffs which was known to defendants or was so obvious that defendants must have been aware of it. *Id.*

---

12. Similarly, the mere fact that defendants Pompliano and Piazza resigned as executive officers and that defendants Giess and Trouveroy resigned from the Board of Directors during the Class Period is hardly proof of fraudulent intent.

### (c)

### *Summary—Count I*

In sum, this Court, after considering the totality of the circumstances here, concludes on this record that plaintiffs have not satisfied their burden of establishing defendants' liability under § 10(b) of the Exchange Act and Rule 10b–5. Plaintiffs have not in their Complaint alleged with particularity facts establishing that defendants had a motive to commit fraud nor have they alleged facts constituting circumstantial evidence of either reckless or conscious behavior. Since the allegations of the Complaint do not, as mandated by the PSLRA, give rise to a "strong inference" that defendants acted with the required wrongful state of mind, Count I of the Complaint will be dismissed as to all defendants.

### V

### *Count II—Section 20(a)*

In Count II, plaintiffs seek a recovery from the individual defendants and ING pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). It is alleged that the individual defendants and ING controlled the content of public statements made by e.spire, and that, in "reckless disregard of the true status of the business of e.spire, caused the misleading statements and omissions of material fact...."

Section 20(a) of the Exchange Act provides:

> Every person who directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

The language of § 20(a) assigns secondary liability only upon a demonstration of a primary violation by the controlled person and of direct or indirect control by the controlling person. *MicroStrategy*, 115 F.Supp.2d at 659. Thus, a plaintiff's failure to state a proper claim for a primary securities fraud violation precludes a finding of control person liability.

As the Court has determined in Part IV of this Opinion, plaintiffs have failed to adequately allege against any of the defendants a "primary violation" of § 10(b) and Rule 10b–5. Accordingly, this Court concludes that the Complaint also fails to state a cause of action against the individual defendants and ING for secondary control person liability under § 20(a) of the Exchange Act. *See In re Criimi Mae, Inc.*, 94 F.Supp.2d at 662. Count II of the Complaint will therefore be dismissed.

### VI

### *Count III—Section 20A*

Count III of the Complaint asserts a claim against only defendants Pompliano, Hudson and ING for engaging in insider trading in violation of § 20A of the Exchange Act, 15 U.S.C. § 78t–1, and the rules and regulations promulgated thereunder.

Like a claim for control person liability asserted under § 20(a), a § 20A claim must contain a well-pled predicate violation of the Exchange Act. *In re MicroStrategy*, 115 F.Supp.2d at 662 (*citing In re VeriFone Securities Litig.*, 784 F.Supp. 1471, 1488–89 (N.D.Cal.1992)). No such violation of any provision of the Exchange Act has been adequately alleged in the Complaint. Accordingly, Count III of the Complaint will also be dismissed.

### VII

### *Conclusion*

For all these reasons, this Court concludes that plaintiffs have not met the burden imposed upon them by the PSLRA

of adequately pleading violations by defendants of § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. Since Count I of the Complaint must be dismissed, Counts II and III must also fail.

The motion to dismiss of the e.spire defendants will therefore be granted as will the motion to dismiss of the ING defendants.[13] An appropriate Order will be entered by the Court.[14]

13. Since the Court has not herein relied on defendants' Appendix Exhibit 8, plaintiffs' pending motion to strike that Exhibit will be denied as moot.

14. In their proposed Order, the e.spire defendants request that the Complaint be dismissed with prejudice with each party to bear its own costs. The Order entered by the Court will so provide.